**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SWINOMISH INDIAN TRIBAL
COMMUNITY,

     Plaintiff,

        v.

ALEX M. AZAR, et al.,

     Defendants.

No. 1:18-cv-01156-DLF

Honorable Judge Friedrich

**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**
**AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56 and LCvR 7 and oppose Plaintiff's motion for summary judgment. Pursuant to LCvR 7(a)-(c), (h), this motion is accompanied by: (i) the attached combined statement of points and authorities and memorandum in opposition to Plaintiff's motion for summary judgment, (ii) a statement of material facts, (iii) a statement of genuine issues, and (iv) a proposed order.

Dated: April 4, 2019

Respectfully Submitted,

JESSIE K. LIU, D.C. BAR # 472845
United States Attorney for the District of Columbia

DANIEL F. VAN HORN, D.C. BAR # 924092
Chief, Civil Division

By:

/s/ Christopher Hair
CHRISTOPHER HAIR, Pa. BAR # 306656
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
CIVIL DIVISION
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2541

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SWINOMISH INDIAN TRIBAL
COMMUNITY,

      Plaintiff,

          v.

ALEX M. AZAR, et al.,

      Defendants.

No. 1:18-cv-01156-DLF

Honorable Judge Friedrich

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**
**AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................ 1

    A.    IHS Health Care Programs.......................................................................... 1

    B.    Tribal Self-Determination Under the ISDEAA .......................................... 3

    C.    Factual and Procedural Background ........................................................... 9

STANDARD OF REVIEW ........................................................................................................ 12

ARGUMENT ............................................................................................................................. 13

I.     THE ISDEAA AUTHORIZES CONTRACT SUPPORT COSTS ONLY TO
      SUPPORT THE SECRETARIAL AMOUNT AWARDED UNDER THE
      CONTRACT, NOT ADDITIONAL SERVICES THE CONTRACTOR
      PROVIDES USING NON-IHS FUNDS ........................................................ 15

    A.    Medicare, Medicaid, and Other Third-party Payments Include
        Reimbursements for Direct and Indirect Costs .................................... 15

    B.    Section 5326 Prohibits IHS from Paying Contract Support Costs on Non-
        IHS Funds .......................................................................................... 17

    C.    Neither Subsections 5325(a)(2) nor 5325(a)(3)(A) Authorizes IHS to Pay
        CSC on Non-IHS Funds....................................................................... 21

    D.    Congress's Prohibition Against Using Program Income to *Reduce* Funds
        Otherwise Available to Tribal Contractors Cannot Reasonably Be Read to
        Require the *Additional* Payment of CSC on the Tribe's Expenditure of
        Program Income .................................................................................. 28

II.    PLAINTIFF HAS FAILED TO SUSTAIN ITS BURDEN OF PROVING
      DAMAGES FROM THE ALLEGED BREACH OF CONTRACT................................ 33

CONCLUSION........................................................................................................................... 36

## TABLE OF AUTHORITIES

**Cases**

*Allen v. United States*, 140 Fed. Cl. 550 (Fed. Cl. 2018) ............................................. 13

*Am. Pac. Roofing Co. v. United States,* 21 Cl. Ct. 265 (1990) .................................... 4, 6

*Arctic Slope Native Ass'n v. Sebelius*, 629 F.3d 1296 (Fed. Cir. 2010) ........................................ 9

*Arctic Slope Native Ass'n, Ltd. v. Sebelius*, 567 U.S. 930 (2012) .................................................. 9

*Assurance Co. v. United States*, 813 F.2d 1202 (Fed. Cir. 1987) ................................................. 14

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) ..................................................................... 13

*Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262 (D.C. Cir. 2008) ................................. 13

*Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631 (2005) ............................................................. 9

*Chickasaw Nation v. United States*, 534 U.S. 84 (2001) .......................................................... 13, 18

*Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460 (D.C. Cir. 2007) ............. 13

*Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*, 830 F.3d 552 (D.C. Cir. 2016) 13

*Cook Inlet Trial Council, Inc. v. Mandregan*, 348 F. Supp. 3d 1 (D.D.C. 2018) ................... passim

*Corley v. United States*, 556 U.S. 303 (2009) .............................................................................. 23

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............................................. 32

*FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990) .............................................................................. 13

*Gonzalez-McCaulley Inv. Grp. v. United States*, 93 Fed. Cl. 710 (2010) .................................... 13

*Haehn Mgt. Co. v. United States*, 15 Cl. Ct. 50 (Cl. Ct. 1988) ....................................... 14, 34, 36

*HCSC–Laundry v. United States*, 450 U.S. 1 (1981) ................................................................... 23

*Jones v. Bock*, 549 U.S. 199 (2007) ............................................................................................. 30

*Ketchikan Indian Cmty. v. HHS*, CBCA 1053 .......................................................................... 13

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ......................................................................................... 22

*Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed.Cir.1987) .................................... 14

*M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323 (Fed. Cir. 2010) .................. 14, 18

*Mingo Logan Coal v. EPA*, 714 F.3d 608 (D.C. Cir. 2013) .......................................................... 23

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ....................................................... 23

*Navajo Health Foundation—Sage Memorial Hospital v. Burwell*,
    263 F. Supp. 3d 1083 (D.N.M. 2016) ......................................................................... 10, 32, 33

*Navajo Nation v. Dalley*, 896 F.3d 1196 (10th Cir. 2018)............................................................... 31

*NRA v. Reno*, 216 F. 3d 122 (D.C. Cir. 2000) .............................................................................. 31

*Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534 (D.D.C. 2014)............................ 26, 27

*Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997) ............................ 10, 18, 19, 26

*Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338 (D.C. Cir. 1996) ........................................ 9

*Red Lake Band of Chippewa Indians v. U.S. Dept. of Interior*,
    624 F. Supp. 2d 1 (D.D.C. 2009) .................................................................................... 13, 21

*Russello v. United States*, 464 U.S. 16 (1983) .............................................................................. 31

*Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012) .............................................................. 9

*Samish Indian Nation v. United States,* 419 F.3d 1355 (Fed. Cir. 2005) ...................................... 26

*San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957 (Fed. Cir. 1989) ...................... 13

*Seminole Tribe of Fla. v. Azar, et al.*,
    No. 1:18-cv-776, 2019 WL 1359478 (D.D.C. Mar. 26, 2019) .................................... 10, 20, 21

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ............................................................................ 31

*TLT Constr. Corp. v. United States*, 60 Fed. Cl. 187 (Fed. Cl. 2004) ........................................... 14

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) .................................................................................... 20

*Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382 (D.D.C. 2008)................. passim

*Wilner v. United States*, 24 F.3d 1397 (Fed. Cir. 1994) .......................................................... 34, 35

*YRC, Inc. v. United States*, 104 Fed. Cl. 360 (Fed. Cl. 2010)................................................. 13, 34

**Statutes**

25 U.S.C. § 13 ................................................................................................................................ 1

25 U.S.C. § 450 .............................................................................................................................. 1

25 U.S.C. § 1601 .......................................................................................................................... 35

25 U.S.C. § 1641 .................................................................................................................... passim

25 U.S.C. § 5301 ............................................................................................................................ 1

25 U.S.C. § 5304 .................................................................................................................... 31

25 U.S.C. § 5305 ...................................................................................................................... 7

25 U.S.C. § 5321 ................................................................................................................. 4, 26

25 U.S.C. § 5325 .................................................................................................................... 23

25 U.S.C. § 5325 ............................................................................................................... passim

25 U.S.C. § 5326 ............................................................................................................... passim

25 U.S.C. § 5327 .................................................................................................................... 18

25 U.S.C. § 5331 .................................................................................................................. 4, 5

25 U.S.C. § 5386 ...................................................................................................................... 8

25 U.S.C. § 5388 .................................................................................................. 23, 29, 30, 35

25 U.S.C. § 5396 ...................................................................................................................... 4

25 U.S.C. § 1621f .................................................................................................................... 2

31 U.S.C. § 503 ........................................................................................................................ 7

41 U.S.C. § 7101 ...................................................................................................................... 4

41 U.S.C. § 7103 .................................................................................................................. 5, 34

42 U.S.C. 1395x ..................................................................................................................... 16

42 U.S.C. 1395qq .................................................................................................................... 2

42 U.S.C. 1396a ..................................................................................................................... 17

Pub. L. No. 83-568 ................................................................................................................... 2

Pub. L. No. 93-638 ................................................................................................................... 8

Pub. L. No. 100-472 ................................................................................................................. 8

Pub. L. No. 103-413 ............................................................................................................. 8, 9

Pub. L. No. 105-277 ....................................................................................................... 8, 10, 18

Pub. L. No. 106-260 ............................................................................................................ 4

Pub. L. No. 112-74 .......................................................................................................... 18

Pub. L. No. 115-141 ..................................................................................................... 3, 9

**Regulations**

2 C.F.R. Part 200 .............................................................................................................. 7

2 C.F.R. Part 225 .............................................................................................................. 7

2 C.F.R. § 200.101 ........................................................................................................ 7, 31

2 C.F.R. § 200.307 ........................................................................................................... 31

2 C.F.R. § 200.403 ............................................................................................................ 7

2 C.F.R. § 200.413 ............................................................................................................ 6

2 C.F.R. § 200.416 ............................................................................................................ 6

2 C.F.R. § 200.80 ........................................................................................................ 35, 36

25 C.F.R. § 900.73 .......................................................................................................... 28

42 C.F.R. § 405.2462 ...................................................................................................... 16

45 C.F.R. Part 75 .............................................................................................................. 8

70 Fed. Reg. 51910 ........................................................................................................... 7

**Legislative History**

1988 U.S.C.C.A.N. 2620 ................................................................................................ 10

## INTRODUCTION

Plaintiff, Swinomish Indian Tribal Community, seeks a construction of the Indian Self Determination and Education Assistance Act ("ISDEAA") (codified as amended at 25 U.S.C. § 5301 *et seq.*),[1] that would require the Indian Health Service ("IHS") to pay Plaintiff direct and indirect costs that have already been reimbursed by Medicare, Medicaid, and other third party payers. Plaintiff's request is contrary to the plain language of the ISDEAA. Defendants have paid all costs allowed under the ISDEAA and are entitled to judgment as a matter of law.

Even if the Court were to conclude that such costs might generally be allowable under the ISDEAA, Plaintiff has failed to show that it has not already been reimbursed for such costs, and has otherwise failed to sustain its claim for damages. Third-party payers cover direct and indirect costs in their reimbursements, and the ISDEAA does not authorize IHS to pay these same expenses as contract support costs. Accordingly, this Court should deny Plaintiff's motion for summary judgment, grant Defendants' cross-motion for summary judgment, and enter judgment for Defendants.

## BACKGROUND

### A.  IHS Health Care Programs

IHS delivers heath care to more than two million American Indians and Native Alaskans directly through IHS facilities and indirectly through ISDEAA contracts. *See* 25 U.S.C. §§ 13 ("Snyder Act"),[2] 1601–83 ("Indian Health Care Improvement Act" ("IHCIA")), 5301 *et seq.* For

---

[1] On August 1, 2016, the U.S. House of Representatives, Office of the Law Revision Counsel, transferred the codification of the ISDEAA from 25 U.S.C. § 450 *et seq.* to 25 U.S.C. § 5301 *et seq.* All ISDEAA citations in this filing have been updated to reflect the new codification.

[2] In 1954, Congress transferred the health-care related functions of the Snyder Act from the Department of the Interior to Health, Education, and Welfare, the predecessor of the Department of Health and Human Services ("HHS"). *See* Pub. L. No. 83-568, 68 Stat. 674 (1954) (codified at 42 U.S.C. § 2001).

Fiscal Year ("FY") 2010 (the year at issue in this case), Congress appropriated approximately

$4.05 billion to IHS for tribal health programs.  *See* IHS, FY 2011 Justification of Estimates for

Appropriations Committees. ("IHS FY 2011 Justification"), at CJ-6 (2010),

https://www.ihs.gov/budgetformulation/includes/themes/responsive2017/documents/FY2011Con

gressionalJustification.pdf (showing enacted FY 2010 appropriations).

### 1.   IHS Direct Service Health-Care Programs

IHS directly provides health care to many members of many of the 573 federally-

recognized tribes at IHS service units that it operates.  In the course of providing direct services,

IHS collects reimbursements from Medicare and/or Medicaid programs and, rather than sending

such reimbursements to the general fund at the U.S. Treasury, has been authorized to return them

to each individual IHS health care service unit.  *See, e.g.*, 42 U.S.C. § 1395qq; *see also* 25 U.S.C.

§§ 1621f, 1641.[3]  In FY 2010, IHS collected approximately $835 million from various third

parties, including Medicare, Medicaid, private insurers, and ineligible persons receiving health

care at IHS facilities.  *See* IHS FY 2011 Justification at CJ-6.

### 2.   Tribally-Operated and Tribally-Funded Health Care Programs

Many federally-recognized tribes and tribal organizations have entered into ISDEAA

contracts to operate IHS health care programs.  In FY 2010, IHS transferred approximately $2.29

billion out of its lump-sum services appropriation to tribal contractors to operate IHS health care

programs under ISDEAA contracts.  *See* IHS FY 2011 Justification at CJ-13.  Of this amount,

IHS paid approximately $444 million in contract support costs ("CSC") to these tribal

---

[3] Congress has further provided that the collection of Medicare and Medicaid funds shall
not be taken into account in determining the amount of funds otherwise appropriated for IHS
health care programs.  25 U.S.C. § 1641(a).

contractors.  *See id.* at CJ-14.[4]

In addition to these ISDEAA funds, many tribal contractors obtain reimbursements for health services provided from Medicare, Medicaid, and other third-parties.[5]  Many tribal contractors also receive funds from other non-IHS sources, including states and other federal agencies.  Additionally, many tribes and tribal organizations supplement their IHS funding, state and other federal funding, and other third-party funding with their own tribal funds so that they can provide additional health care services.

## B.  Tribal Self-Determination Under the ISDEAA

### 1.  The Secretarial Amount

At the request of a tribe or tribal organization, the ISDEAA requires the Secretary of Health and Human Services ("HHS") to enter into an ISDEAA contract for the tribal contractor to take over a health care program, function, service, or activity (hereafter collectively referred to as an "IHS program") that IHS was performing for the benefit of the tribe or its members.  *See* 25 U.S.C. §§ 5321(a)(1); 5396.[6]  Once the parties enter into a contract, IHS transfers to the tribal contractor the amount of funds the agency had allocated, or would have allocated for its

---

[4] Since 2016, Congress has separately appropriated "such sums as may be necessary" for IHS's payment of tribes' CSC.  *See, e.g.*, Pub. L. No. 115-141, 132 Stat. 348.  CSC is explained below, *see infra*, at 5.

[5] Tribal contractors may, for example, seek and collect third-party reimbursements from Medicare and Medicaid, 25 U.S.C. § 1641(d); private insurance companies, *id.* § 1621e(a); workers' compensation funds, *id.* § 1621e(b); tortfeasors, *id.* § 1621e(e)(3)(A), and ineligible persons, *id.* § 1680c.

[6] Tribes that meet certain financial criteria may enter into a government-to-government compact to administer the IHS program.  *See generally* Pub. L. No. 106-260, § 4 (Aug. 18, 2000), 114 Stat. 7130 (codified at 25 U.S.C. §§ 5381-99).  Tribes entering into compacts are known as Title V tribes.  The funding provisions are the same.  *See* 25 U.S.C. § 5396 (making § 5325(a) applicable to compacts).  This brief's use of the term contract incorporates the term compact.

continued operation of the program, for the tribal contractor to operate the program. *See id*.

§ 5325(a)(1). This is known as the "Secretarial amount."

IHS can decline a tribe's proposal to obtain or renew an ISDEAA contract pursuant to

one or more statutory criteria. *See id*. §§ 5321(a)(2)(A)-(E); 5387(c)(1)(A)(i)-(iv). A tribe can

obtain *de novo* federal court review of an agency declination and may be entitled to injunctive

relief awarding or renewing the contract. *See id*. § 5331(a).

When a dispute arises after the contract is awarded, a tribal contractor must pursue a

claim for breach of contract pursuant to the requirements of the Contract Disputes Act ("CDA"),

41 U.S.C. § 7101 *et seq*. *See* 25 U.S.C. § 5331(a), (d) (incorporating requirements of the CDA

for breach of contract claims). The CDA provides a comprehensive statutory system of legal and

administrative remedies for resolving government contract claims. *See Am. Pac. Roofing Co. v.

United States,* 21 Cl. Ct. 265, 267-68 (1990) (citing S. Rep. No. 1118, 95th Cong., 2d Sess. 1

(1978), *reprinted in* 1978 U.S.C.C.A.N. 5235). The CDA requires a contractor to present a

certified claim to the agency contracting officer within six years after the accrual of the claim,

*see* 41 U.S.C. § 7103(a)(1), (4)(A), (b), after which the contracting officer must issue a written

decision,  *see id*. § 7103(d).[7] A contractor may bring an action directly in federal court within

twelve months of the contracting officer's decision. *See id*. § 7104(b)(1), (3); *see also* 25 U.S.C.

§ 5331(a) (allowing a tribal contractor to proceed in the court of claims or in a district court).

### 2.  Contract Support Costs

When a tribal contractor obtains or renews an ISDEAA contract, the ISDEAA not only

requires the agency to pay the tribe the Secretarial amount but also requires the agency to add

---

[7] The CDA also authorizes the agency's contracting officer to present a claim (or counterclaim) against the contractor. *See id*. § 7103(b)(3).

"an amount" to the contract to reimburse the tribe for its CSC.  *See* 25 U.S.C. § 5325(a)(2), 3(A).

In authorizing the payment of CSC, Congress requires IHS to pay:

> an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—
>
> (A) normally are not carried on by the respective Secretary in his direct operation of the program; or
>
> (B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

*Id.* § 5325(a)(2).

Congress further provides that costs that are "eligible … for the purposes of receiving [CSC] funding … include the costs of reimbursing each tribal contractor for reasonable and allowable" expenses, including both:

> (i) direct program expenses for the operation of the Federal program that is the subject of the contract, [and]
>
> (ii) any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program … pursuant to the contract.

*Id.* § 5325(a)(3)(A)(i)-(ii).

Congress additionally requires that CSC cannot "duplicate" funds provided as part of the Secretarial amount.  *Id.* § 5325(a)(3)(A).[8]

---

[8] The CSC at issue in this case thus contains two components:

(1) Direct CSC, which are direct costs that a tribe must incur to operate the specific program at issue.  *Accord* 2 C.F.R. § 200.413.  Workers compensation is a common example of direct CSC.  Direct costs are CSC only if IHS did not already include funding for such costs in the Secretarial amount.  *See* 25 U.S.C. § 5325(a)(2), (3)(A).

(2) Indirect CSC, which are the IHS's share of a tribe's indirect costs.  *See id.*  Indirect costs ("IDC") are pooled overhead costs that benefit more than one program, such as the costs of running information technology and payroll departments, or conducting audits.  *See id.*; *accord* 2 C.F.R. § 200.416.  An agency may pay only those costs which are "allocable" to the program.

To clarify the requirement that such costs must be allocable to the IHS Secretarial amount identified under the ISDEAA contract, Congress expressly prohibits the expenditure of any ISDEAA funding, including the Secretarial amount and CSC funding, for direct and indirect costs associated with any and all non-IHS funds.  *See* 25 U.S.C. § 5326.

### 3. Program Income

#### a. Program Income Under Cost Principles of the Office of Management and Budget

The ISDEAA requires tribes to apply the cost principles established by the Office of Management and Budget ("OMB").  *See, e.g.,* 25 U.S.C. § 5305 (requiring tribes to comply with the Single Audit Act, 31 U.S.C. § 7501 *et seq.*); *id.* § 5386(c)(2) (expressly requiring Title V tribes to apply OMB Cost Principles); 31 U.S.C. § 503 (requiring OMB to establish financial management policies and requirements published at 2 C.F.R. Part 200).[9]  OMB's cost principles ensure that costs incurred in the expenditure of federal awards to non-federal entities are reasonable, allowable, and allocable.  *See* 2 C.F.R. §§ 200.403-05; *see also* 2 C.F.R. Part 200 App. VII.

Additionally, OMB cost principles establish a default rule that income earned by a federal program normally must be deducted from a federal funding recipient's otherwise allowable costs to determine net allowable costs.  *See id.* § 200.307(e)(1); *cf.* 2 C.F.R. § 200.101(b)(3) (providing that "in any circumstances where the provisions of Federal statutes or regulations differ from the provisions of this part, the provision of the Federal statutes or regulations govern").

---

*See* 2 C.F.R. § 200.416.  Additionally, indirect costs are CSC only if IHS did not already include funding for such costs in the Secretarial amount.  *See* 25 U.S.C. § 5325(a)(2), (3)(A).

[9] The previous version of these regulations was published as OMB Circular A-87 at 2 C.F.R. Part 225 (2005).  *See* Cost Principles for State, Local, and Indian Tribal Governments (OMB Circular A–87), 70 Fed. Reg. 51910 (Aug. 31, 2005).

### b.  Program Income under the ISDEAA

Overriding OMB's default rule, the ISDEAA expressly provides that "program income earned by a trib[e] in the course of carrying out a[n] [ISDEAA] contract … shall be used by the tribal contractor to further the general purposes of the contract."  25 U.S.C. § 5325(m).  For Title V tribal contactors, the ISDEAA further provides that "[a]ll Medicare, Medicaid, or other program income earned by an Indian tribe shall be treated as supplemental funding to that negotiated in the funding agreement" and that "[s]uch funds shall not result in any offset or reduction in the amount of funds the Indian tribe is authorized to receive under its funding agreement."  *Id.* § 5388(j).  All other OMB cost principles apply to ISDEAA contracts.  *See* 25 U.S.C. § 5386(c)(2); 45 C.F.R. Part 75 (IHS regulations adopting OMB cost principles); Indian Health Manual ("IHM"), Part 6, Ch. 3, Ex. 6-3-G, § A(3)(a)(3) (requiring that costs "[b]e necessary and reasonable for the performance of the Federal award and be allocable thereto under [OMB cost] principles."); *id.* at § A(3)(C)(3) (providing that "[a]ny cost allocable to a particular Federal award under the principles provided for in this part may not be charged to other Federal awards to overcome fund deficiencies, to avoid restrictions imposed by Federal statutes, regulations, or terms and conditions of the Federal awards.").

Program income does not come from IHS.  Tribal contractors directly bill third-party payers and are directly reimbursed by those third parties.  *See, e.g.,* 25 U.S.C. § 1641(d).[10]

### 4.  History of Contract Support Cost Litigation

When originally enacted, the ISDEAA did not provide for CSC funding to tribal contractors and, instead, only authorized funding for the Secretarial amount.  *See* Pub. L. No. 93-

---

[10] Alternatively, tribal contactors may elect to use IHS as an intermediary for payments from Medicare and Medicaid.  *See id.* § 1641(c).  In that circumstance, Congress requires IHS to act as a pass-through entity and distribute 100 percent of the funds to the contractor.  *See id.*

638 ("638"), § 106, 88 Stat. 2203 (1975).  Congress added provisions concerning CSC in 1988,

1994, and 1998.  *See* Pub. L. No. 100-472, 102 Stat. 2285, 2292-93 (1988) (codified at 25 U.S.C.

§ 5325(a)(2)); Pub. L. No. 103-413, 108 Stat. 4250, 4257 (1994) (codified at 25 U.S.C.

§ 5325(a)(3)(A)); Pub. L. No. 105-277, Div. A, § 101(e) [Title II] (1998), 112 Stat. 2681-231,

2681-280 (codified at 25 U.S.C. § 5326).[11]

Congress, however, did not provide sufficient appropriations to pay all tribal contractors'

CSC, and from 1998 through 2013, capped annual appropriations to IHS for CSC.  *See, e.g.*, 108

Stat. 2527 (1994) (lump sum appropriation); 1999 Appropriations Act, 112 Stat. 2681, 2681-729

(1999) (capped appropriation).  IHS administered its appropriations by developing a policy for

the equitable allocation of its appropriations among all of its ISDEAA contractors.  This

allocation of the capped appropriations led to years of litigation.  Initially, courts not only

approved, but indeed required, contracting agencies to allocate CSC in this manner.  *See, e.g.,*

*Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1348-49 (D.C. Cir. 1996).  The Supreme

Court, however, eventually held that IHS was liable for damages arising from breach of contract

claims despite these limits on the availability of appropriations.  *See Cherokee Nation of Okla. v.*

*Leavitt*, 543 U.S. 631, 639 (2005) (IHS liable despite limited lump-sum appropriation); *Salazar*

*v. Ramah Navajo Chapter*, 567 U.S. 182, 185 (2012) (Bureau of Indian Affairs liable despite

capped appropriation); *see also Arctic Slope Native Ass'n, Ltd. v. Sebelius*, 567 U.S. 930 (2012)

(*vacating Arctic Slope Native Ass'n v. Sebelius*, 629 F.3d 1296 (Fed. Cir. 2010), in light of

---

[11] When adding the CSC provisions, Congress also expressed concern that IHS and the Bureau of Indian Affairs were not transferring all of their resources, particularly for administrative functions, to the tribes to allow the tribes to carry out contract requirements.  *See, e.g.*, S. Rep. No. 100-274, at 9 (1988), *reprinted at* 1988 U.S.C.C.A.N. 2620, 2628. Accordingly, Congress also amended the Secretarial amount to clarify that the agencies must include all such resources in that amount.  *See* Pub. L. No. 103-413, 108 Stat. 4250, 4257 (1994) (amending § 5325(a)(1)).

*Ramah Navajo*, making IHS liable despite overall cap on total CSC in appropriation).  Since

2016, Congress has appropriated "such sums as may be necessary" for IHS's payment of tribal

contractors' CSC.  *See, e.g.*, Pub. L. No. 115-141, 132 Stat. 348 (2018).

This case, however, does not concern insufficient appropriations but instead seeks to

construe the ISDEAA to require an expanded definition of CSC.  Tribal contractors have brought

similar claims before, but have found less success.  *See Ramah Navajo Chapter v. Lujan*, 112

F.3d 1455 (10th Cir. 1997), *overruled*, Pub. L. No. 105-277, Div. A, § 101(e) [Title II] (Oct. 21,

1998), 112 Stat. 2681-231, 2681-280 (codified at 25 U.S.C. § 5326).  In passing § 5326,

Congress clarified that:

> notwithstanding any other provision of law, … no funds appropriated by this …
> Act shall be available for any contract support costs or indirect costs associated
> with any … funding agreement entered into between an Indian tribe or tribal
> organization and any entity other than the [IHS].

25 U.S.C. § 5326.  Since its passage, only two courts has ruled on the meaning of § 5326.

*See Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382, 418 (D.D.C. 2008) (Walton,

J.), *reconsideration denied*, 655 F. Supp. 2d 62 (2009); and *Seminole Tribe of Fla. v. Azar, et al.*,

No. 1:18-cv-776, 2019 WL 1359478 (D.D.C. Mar. 26, 2019) (Contreras, J.).  Other decisions

concerning a tribal contractor's attempt to expand the definition of CSC are *Navajo Health

Foundation—Sage Memorial Hospital v. Burwell*, 263 F. Supp. 3d 1083 (D.N.M. 2016); and

*Cook Inlet Trial Council, Inc. v. Mandregan*, 348 F. Supp. 3d 1 (D.D.C. 2018) (Sullivan, J.),

*appeal filed*, No. 19-5005 (D.C. Cir.).

### C.  Factual and Procedural Background

Plaintiff is a federally recognized Indian tribe located in Skagit County, Washington.  In

1997, Plaintiff entered into an ISDEAA contract with IHS to take over operation of IHS health

care programs on the Swinomish Indian Reservation and has continued to contract under the

ISDEAA on an annual basis.  For Calendar Year ("CY") 2010, Plaintiff's ISDEAA agreement

consisted of Plaintiff's Compact and its 2010 Funding Agreement.  *See* Compact of Self-

Governance Between Swinomish Indian Tribal Cmty. & U.S. (Jan. 1, 2002), Pl.'s Ex. A, ECF

No. 21-3; Funding Agreement Between Swinomish Indian Tribal Cmty. & U.S. for CY 2010

("Pl.'s 2010 FA") (Feb. 19, 2010), Pl.'s Ex. B., ECF No. 21-4.

Plaintiff's Compact provides for it to operate, among other things, the IHS programs

identified in its Funding Agreement.  *See* Compact, Art. III, § 3.  Among other provisions, the

Compact provides that "[a]ll Medicare, Medicaid and other program income earned by the Tribe

shall be treated as *additional supplemental* funding to that negotiated by the [Funding

Agreement]."  *Id*. § 5 (emphasis added).

Plaintiff's Funding Agreement provides for Plaintiff to operate nine IHS programs on the

Swinomish Reservation, including: (i) "reporting;" (ii) the "medical clinic;" (iii) "dental

services;" (iv) the "model diabetes project;" (v) "substance abuse counseling;" (vi) the

"community health representative;" (vii) "social work/mental health;" (viii) "contract health

services;" and (ix) "third party billing."  Pl.'s 2010 FA § 2(B).  For third party billing, the

Funding Agreement provides that "[t]he purpose of this program is to maintain a system of third

party payment collection for services provided to patients of the Swinomish Tribal Health

Program."  *Id*. § 2(B)(ix).

To operate these nine programs, the parties agreed that IHS would pay Plaintiff the

Secretarial amount reflected in the "CY 2010 Self-Governance FA Table" as well a fixed amount

of direct and indirect CSC, subject to adjustment based on "changes in program bases, Tribal

CSC need, and available CSC appropriations."  *Id*. § 6.  The parties agreed that "CSC funding …

w[ould] be calculated and paid in accordance with … the [ISDEAA] … [and] the IHS CSC

Policy [IHM] – Part 6, Chapter 3." *Id*.

By letter dated December 20, 2016, Plaintiff presented, pursuant to the CDA, a certified claim to the IHS contracting officer for an additional $245,867.00 in CSC funding for CY 2010. *See* Letter from Merril Burke, Chief Fin. Officer, Swinomish Indian Tribal Cmty., to Mary Smith, Principal Deputy Dir., IHS ("Pl.'s Claim") at 2-3 (Dec. 20, 2016), Pl.'s Ex. E, ECF No. 21-7. Plaintiff claimed this additional amount based on IHS's alleged failure "to pay CSC associated with the portion of the Tribe's federal health care program funded by third-party revenues, such as payments from Medicare, Medicaid, and private insurance." *Id*. at 2; *see also* Pl.'s Mem. in Supp. of Mot. for Summ. J., at 17–24, ECF No. 21-2. Plaintiff's basis of support for its Claim was to generally refer to its CY 2010 audit. *See* Pl.'s Claim at 2 ("As documented in the Tribe's CY 2010 audit, a copy of which is in IHS's possession, the Tribe expended $664,151 in third-party revenues in CY 2010."); Moss Adams LLP, Rep. of Indep. Auditors & Primary Gov't Fin. Statements with Supp. Info. for the Swinomish Indian Tribal Cmty. (Component Units Not Included) Year Ended Dec. 31, 2010 ("Pl.'s 2010 Audit") at 14, 78, Pl.'s Ex. D, ECF No. 21-6.

By letter dated May 22, 2017, IHS's contracting officer denied Plaintiff's claim. *See* Letter from Elizabeth Fowler, Deputy Dir., IHS, to Merril Burke (May 22, 2017), Pl.'s Ex. F, ECF No. 21-8.[12]

On May 17, 2018, Plaintiff brought suit against IHS in this Court. *See* Compl., ECF No. 1. IHS filed its answer and counterclaim on July 30, 2018. *See* Answer & Counterclaim, ECF No. 10. Plaintiff filed its answer to the counterclaim on August 17, 2018. *See* Pl.'s Answer to

---

[12] In reviewing Plaintiff's claim, the IHS contracting officer determined that it inadvertently overpaid Plaintiff by $78,133.00 for CY 2010. Accordingly, the IHS contracting officer asserted a counterclaim against Plaintiff for that amount. *Id.* at 2-3, 8.

Counterclaim, ECF No. 11.  On January 11, 2019, Swinomish filed a motion for summary

judgment.  *See* Pl.'s Mot. for Sum. J., ECF No. 21.  On April 4, 2019, IHS withdrew its

counterclaim.  *See* Amended Answer, ECF No. 26-1.  Defendants now respectfully file their

opposition to that motion and a cross motion for summary judgment.

### STANDARD OF REVIEW

In interpreting the ISDEAA's provisions, this Court should begin with the "language of

the statute."  *Red Lake Band of Chippewa Indians v. U.S. Dept. of Interior*, 624 F. Supp. 2d 1, 24

(D.D.C. 2009) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)).  "If Congress

has directly spoken to the issue, that is the end of the matter."  *Confederated Tribes of Grand

Ronde Cmty. of Oregon v. Jewell*, 830 F.3d 552, 558 (D.C. Cir. 2016) (citing *Citizens Exposing

Truth About Casinos v. Kempthorne*, 492 F.3d 460, 465 (D.C. Cir. 2007)).  Only if the terms are

ambiguous should they be "construed liberally" to the benefit of the tribes.  *See id*. (quoting *Cal.

Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 n.7 (D.C. Cir. 2008)).  Even so, this

canon may not be determinative of how to read the ISDEAA.  *Accord Chickasaw Nation v.

United States*, 534 U.S. 84, 94 (2001) ("[T]o accept as conclusive the canons on which the Tribes

rely would produce an interpretation that we conclude would conflict with the intent embodied in

the statute Congress wrote.").

To proceed under the CDA, a plaintiff bears the burden of establishing jurisdiction.  *See

YRC, Inc. v. United States*, 104 Fed. Cl. 360, 364 (Fed. Cl. 2010) (citing *FW/PBS, Inc. v. Dallas*,

493 U.S. 215, 231 (1990)).  Additionally, under the CDA, "[t]o recover for breach of contract, a

party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty

arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."

*Allen v. United States*, 140 Fed. Cl. 550, 560 (Fed. Cl. 2018) (citing *San Carlos Irr. & Drainage

Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)).  Moreover, "there is a minimum

burden for a plaintiff, in asserting a breach of contract claim, to explicitly identify the provisions and terms of the contract that have been breached." *Id.* (quoting *Gonzalez-McCaulley Inv. Grp. v. United States*, 93 Fed. Cl. 710, 715 (2010)); *see also Ketchikan Indian Cmty. v. HHS*, CBCA 1053-ISDA, 1054-ISDA, 1055-ISDA, 13 BCA ¶ 35,436 (burden to establish liability in CSC claims includes "establishing that a particular cost is a CSC"). Additionally, "[t]he contractor bears the burden of proving the amount of its damages 'with sufficient certainty so that the determination of damages will be more than mere speculation.'" *Haehn Mgt. Co. v. United States*, 15 Cl. Ct. 50, 60 (Cl. Ct. 1988) (quoting *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed.Cir.1987)), *aff'd*, 878 F.2d 1445 (Fed. Cir. 1989). When suit is brought following a contracting officer's decision, "the findings of fact in that decision are not binding upon the parties and are not entitled to deference. The contractor has the burden of proving the fundamental facts of liability and damages *de novo*." *TLT Constr. Corp. v. United States*, 60 Fed. Cl. 187, 193 (Fed. Cl. 2004) (citing *Assurance Co. v. United States*, 813 F.2d 1202, 1205 (Fed. Cir. 1987)).

When the standards of Fed. R. Civ. P. 56(c) are otherwise met, CDA claims may be resolved by cross motions for summary judgment. *See, e.g., M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323 (Fed. Cir. 2010).

## <u>ARGUMENT</u>

Plaintiff seeks a construction of the ISDEAA that is contrary to the plain language of the statute. Under the ISDEAA, Plaintiff's contract requires IHS to pay Plaintiff the full amount of CSC required for Plaintiff to operate the IHS health care programs on the Swinomish Reservation. Plaintiff asserts that this contractual promise also includes a promise to pay CSC on Plaintiff's expenditure of program income it has earned from billing and obtaining reimbursements from non-IHS entities including Medicare, Medicaid, and other third-party

payors for additional health care services it has provided beyond those required by Plaintiff's ISDEAA contract.

Medicare, Medicaid, and other non-IHS, third party-payers, however, already provide reimbursement for the direct and indirect costs of providing those third party services.  No reasonable reading of the ISDEAA, moreover, requires IHS to pay CSC on these additional expenditures of these non-IHS funds, and no ambiguity in the terms of the statute could permit such a construction.  The plain meaning of the ISDEAA only requires IHS to pay CSC on the Secretarial amount and expressly prohibits payment of direct and indirect costs associated with expenditures of non-IHS funding.  Additionally, the ISDEAA's recognition of "program income" from Medicare, Medicaid, and other third-party reimbursements cannot reasonably be construed to override these clear statutory provisions.  As a result, Plaintiff cannot show a breach of contract and cannot show that it is entitled to damages to compensate it for this alleged underpayment.

In any event, Plaintiff fails to meet its burden under the CDA of proving its damages resulting from the alleged breach of contract.  Plaintiff's sole source of documentary evidence regarding its claimed program income is its 2010 Audit, which fails to sustain Plaintiff's damages claims.  Plaintiff has come forth with no documentary evidence to show that the costs claimed are CSC.  Additionally, Plaintiff's resort to its own shorthand calculation for inventing an amount for damages is not a reasonable basis for proving its claimed costs.

Accordingly, this Court should deny Plaintiff's motion for summary judgment and should grant Defendants' cross motion for summary judgment.

## I.   THE ISDEAA AUTHORIZES CONTRACT SUPPORT COSTS ONLY TO SUPPORT THE SECRETARIAL AMOUNT AWARDED UNDER THE CONTRACT, NOT ADDITIONAL SERVICES THE CONTRACTOR PROVIDES USING NON-IHS FUNDS

Under the ISDEAA, Congress has authorized payment of CSC for "reasonable and allowable" costs necessary to "reimburse" tribes for direct and indirect costs not covered by the Secretarial amount, not to provide tribes with recovery of costs already reimbursed as part of funds received from non-IHS sources, including Medicare, Medicaid, and other third-party collections. *See* 25 U.S.C. §§ 5325(a)(2), (3)(A). Indeed, Congress has expressly prohibited payment of CSC for costs associated with non-IHS funds. *See id*. § 5326. Applying the language of these provisions to the question presented in this case could not provide a more clear result. No matter how the non-IHS funds from Medicare, Medicaid, and other third party reimbursements are considered, the ISDEAA does not allow Plaintiff to obtain recovery of direct and indirect costs generated by the expenditure of those non-IHS funds.

### A.   Medicare, Medicaid, and other Third-party Payments Include Reimbursements for Direct and Indirect Costs

Plaintiff's claim for damages for breach of contract ignores the fact that Medicare, Medicaid, and other third-party payments provide for reimbursement for the direct and indirect costs associated with providing health care services. To the extent Plaintiff has expended reimbursements it obtained from the Medicare and Medicaid programs, those reimbursements already include direct and indirect costs associated with providing those services. Additionally, Plaintiff must obtain full reimbursement for services it provides to ineligible persons.

Although Plaintiff mentions Medicare reimbursement as one form of program income it has received, *see, e.g.,* Pl.'s Mem. at 10, 30, Plaintiff has not identified the precise reimbursement system it is participating in under the Medicare program. To the extent Plaintiff is seeking reimbursement for outpatient services provided, tribal programs may receive

reimbursements as Federally-Qualified Health Centers ("FQHCs").  *See* 42 U.S.C.

§ 1395x(aa)(4).  FQHCs are reimbursed based on a Prospective Payment System ("PPS").  *See*

42 C.F.R. § 405.2462(c).  Tribal health clinics may also receive reimbursement as Rural Health

Clinics ("RHCs").  *See* 42 U.S.C. 1395x(aa)(2).  RHCs are reimbursed based on an all-inclusive

rate, which is based on reasonable cost principles.  *See* 42 C.F.R. § 405.2462(a)-(b).  Under

either reimbursement system, Medicare payments include reimbursement for direct and indirect

costs associated with providing Medicare services.  *See generally* Ctrs. for Medicare & Medicaid

Servs. ("CMS"), Provider Reimbursement Manual, Ch. 21 § 2102.1 ("Reasonable cost takes into

account both direct and indirect costs of providers …. The objective is that under the methods of

determining costs, the costs for individuals covered by the program are not borne by others"); *see*

*also, e.g., id.* § 2122.3 (determining that employment-related taxes are a type of reimbursable

administrative costs).

Plaintiff also mentions Medicaid reimbursement as another form of program income it

has received, *see, e.g.,* Pl.'s Mem. at 10, 30, but again has not identified the precise

reimbursement system it is participating in under the Medicaid program.  Medicaid programs

compensate providers for their direct and indirect costs.  *See e.g.,* 42 U.S.C. § 1396a(bb)

(requiring state Medicaid programs to fully compensate providers for their reasonable costs).

Depending on the system of Medicaid reimbursements in which Plaintiff participates, Plaintiff

enjoys several layers of protection to ensure maximum reimbursement for providing Medicaid

services.  *See* CMS, Comparing Reimbursement Rates, www.cms.gov/Outreach-and-

Education/American-Indian-Alaska-Native/AIAN/LTSS-TA-Center/info/understand-the-

reimbursement-process.html (identifying numerous rates available to ISDEAA contractors); *see*

*also* Wash. State Health Care Auth., Wash. Apple Health (Medicaid), Tribal Health Billing Guide

(Oct. 1, 2016), www.hca.wa.gov/assets/billers-and-providers/tribal-health-bi-20161001.pdf.

Moreover, as a tribal health care provider, Plaintiff is even entitled to "wrap-around" payments

from States in the event that Medicaid managed care plans do not pay the full rate to which

Plaintiff is otherwise entitled. *See* 42 U.S.C. § 1396u-2(h)(2)(C)(ii). Accordingly, Plaintiff

recovered direct and indirect costs for the care it provided to Medicaid-eligible patients.

Additionally, for any services provided to ineligible persons, Plaintiff must obtain full

payment from the patient, his/her insurance, *etc*., for the actual costs of the health services

provided. *See* Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat. 786, 1029

(2011) ("non-Indian patients may be extended health care at all tribally administered or [IHS]

facilities, subject to charges"). Thus, although tribes may provide health care services to

ineligible persons, Congress expressly requires that the tribes recover their costs from those

ineligible persons rather than IHS. *See id.*[13]

## B. Section 5326 Prohibits IHS from Paying Contract Support Costs on Non-IHS Funds

Section 5326 of the ISDEAA prohibits payment of CSC on all non-IHS funds, including

Medicare, Medicaid or any other third-party reimbursements. Congress passed § 5326 for the

express purpose of overruling the Tenth Circuit's opinion in *Ramah Navajo Chapter v. Lujan*,

112 F.3d 1455 (10th Cir. 1997). *See* Pub. L. No. 105-277, Div. A, § 101(e) [Title II] (Oct. 21,

1998), 112 Stat. 2681-231, 2681-280 (codified at 25 U.S.C. § 5326); *see also* H.R. Rep. 105–609

at 57, 108, (1998) (expressing "concern" about the decision made by "the court in the [1997

*Ramah Navajo*] case," and "recommend[ing] ... specifying that IHS funding may not be used to

---

[13] To the extent Plaintiff seeks CSC on program income from additional sources, it has failed to identify what those might be. *See* Pl.'s Claim *passim*; Pl.'s Mem. *passim*.

pay for non-IHS [CSC] support costs."); *id.* at 110 (same).[14]

In *Ramah Navajo*, a certified nationwide class of tribal contractors that had entered into contract with the Bureau of Indian Affairs ("BIA") sought to require that agency to expand its CSC to include non-BIA programs for which the tribal contractors were otherwise *unable* to recover their direct and indirect costs. *See* 112 F.3d at 1459. The Tenth Circuit erroneously found that § 5325(a)(2) was ambiguous; liberally construed the provision for the benefit of the plaintiff tribal contractors; and held that the provision required the BIA to increase its CSC to make up for "the failure of other agencies to pay their full share of indirect costs." *Id.* at 1462.

Congress's reaction was swift: it passed § 5326 to clarify that § 5325(a)(2) meant what it said:

> Before, on, and after October 21, 1998, and notwithstanding any other provision of law, funds available to the [IHS] in this Act or any other Act for Indian self-determination or self-governance contract or grant support costs may be expended only for costs directly attributable to contracts, grants and compacts pursuant to the Indian Self-Determination Act and no funds appropriated by this or any other Act shall be available for any contract support costs or indirect costs associated with any contract, grant, cooperative agreement, self-governance compact, or funding agreement entered into between an Indian tribe or tribal organization and any entity other than the [IHS].

25 U.S.C. § 5326. Congress thus clarified that § 5325(a)(2) could not be construed to require IHS to pay for the direct and indirect costs associated with any non-IHS funds, even if the tribal contractors could not otherwise recover those costs from those non-IHS sources. *Seatrain Shipbuilding Corp. v. Shell Oil Corp.*, 444 U.S. 572, 596 (1980) ("[V]iews of subsequent Congresses … are entitled to significant weight" in interpreting prior legislation, "particularly …

---

[14] Congress passed the same clarifying legislation with respect to the BIA, except that, in light of events that transpired after the Tenth Circuit's ruling, it made that provision applicable to the BIA on and after November 29, 1999. *See* 25 U.S.C. § 5327.

when the precise intent of the enacting Congress is obscure.").

In light of § 5326, it would be improper to construe either §§ 5326 or 5325(a)(2) and (3)(A) to allow a tribal contractor to obtain additional recovery of its direct and indirect costs, once from non-IHS, third parties and then a second time from IHS.[15]  This Court should thus reject any such construction.  *See Tunica*, 577 F. Supp. at 418; *see also Seminole Tribe of Fla.*, 2019 WL 1359478, at *6 (finding that § 5326 limits the definition of CSC set out in § 5325(a)(2), (3)(A), and finding, as result that the ISDEAA "'explicitly prohibits' IHS from 'funding ... indirect costs 'associated with' non-IHS entities.'") (quoting *Tunica*, 577 F. Supp. 2d at 418).

In *Tunica*, the plaintiff tribal contractors alleged a breach of their ISDEAA contracts based on IHS's alleged failure to fully reimburse them for all direct and indirect costs associated with *all* federal programs administered by the plaintiffs, not just those funded by IHS.  *See* 577 F. Supp. 2d at 389-92.  The court found that while the language contained in § 5326 was "inartful," "the only plausible interpretation of § [5326] is the one favored by the defendants; *i.e.*, that the statute prevents the IHS from paying more than its *pro rata* share of the indirect costs incurred by contracting tribes and tribal organizations."  *Id*. at 417-18.  The court thus held that "[s]ection [5326] explicitly prohibits the funding of indirect costs "associated with" non-IHS entities," and further held that "§ [5326] must be considered in interpreting § [5325]."  *Id*. at 418-19.  The *Tunica* court thus concluded that, in light of the plain meaning of § 5326, the only reasonable

---

[15] *See also* IHM, Part 6, Ch. 3, Ex. 6-3-G, § A(3)(a)(3) (requiring that costs "[b]e necessary and reasonable for the performance of the Federal award and be allocable thereto under [OMB cost] principles."); *id*. at § A(3)(C)(3) (providing that "[a]ny cost allocable to a particular Federal award under the principles provided for in this part may not be charged to other Federal awards to overcome fund deficiencies, to avoid restrictions imposed by Federal statutes, regulations, or terms and conditions of the Federal awards.").  Plaintiff agreed in its 2010 FA that its CSC would be funded in accordance with this IHM provision.  *See* Pl.'s 2010 FA, § 6.

interpretation of § 5325(a)(2) is that it requires IHS to only pay CSC for indirect costs that are

properly allocated to IHS.  *See id.* at 422-23 (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)

("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so

construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or

insignificant.")).

In *Seminole*, the plaintiff proposed to reprogram its allocation of funds provided as part of

the Secretarial amount for its FY 2018 funding agreement for salaries, wages, and fringe benefits

from 71 percent to 98.93 percent of the Secretarial amount, and to increase its indirect CSC as a

result.  *See* 2019 WL 1359478, at *3.  The plaintiff proposed to pay for the remaining direct costs

of the IHS program it was under contract to administer with its own tribal funds.  *See id.*  After

finding that the ISDEAA "'explicitly prohibits' IHS from 'funding ... indirect costs 'associated

with' non-IHS entities,'" *id.* at *6 (quoting *Tunica*, 577 F. Supp. 2d at 418), the court found that

the plaintiff appeared to be improperly trying to apply an indirect cost rate that it had negotiated

based on a smaller base for salaries, wages, and fringe benefits to its newly-proposed larger base

in order to obtain an improper increase in CSC.  *See id.* at *7.  The court further found that "if

the base has been inflated—even with IHS funds—and the indirect cost rate does not account for

or offset that inflation, the effect is that the indirect CSC amount is being calculated based in part

on the Tribe's own resources."  *Id.* at *10.  This would be a "problem," the court concluded, as

the Tribe's estimate would be based on costs that are not actually "'attributable to' or 'associated

with' the Tribe's self-determination contract."  *Id.* (citing 25 U.S.C. § 5326).[16]

Notwithstanding any argument Plaintiff might make to the contrary, it is beyond

---

[16] Finding insufficient evidence to rule definitively, the court remanded the case back to
the agency for further negotiations.  *See id.* at *10.

reasonable dispute that program income from Medicare, Medicaid, and other third-party

reimbursements are non-IHS funds.  Section 5326 thus prohibits IHS from paying CSC on the

Plaintiff's expenditure of those reimbursements.

### C.  Neither Subsections 5325(a)(2) nor 5325(a)(3)(A) Authorizes IHS to Pay CSC on Non-IHS Funds

Plaintiff seeks to construe §§ 5325(a)(2) and (a)(3)(A) as requiring IHS to pay CSC on

non-IHS, third party funds because those non-IHS funds are part of the "Federal program" that

Plaintiff is under contract to administer and thus should allegedly be considered an "additional"

part of the Secretarial amount on which IHS is required to pay CSC.  *See* Pl.'s Mem. at 16-22.

Plaintiff's claim is without merit.

Section 5325(a)(1) requires IHS to pay a tribal contractor an "amount of funds … not less

than the appropriate Secretary would have otherwise provided for the operation of the programs

… for the period covered by the contract."  25 U.S.C. § 5325(a)(1).  This is the Secretarial

amount.  In this case, the Secretarial amount is the amount of funds IHS has allocated, pursuant

to its discretion, from its annual lump sum appropriations for IHS health care programs on the

Swinomish Reservation.  *See Lincoln v. Vigil*, 508 U.S. 182 (1993) (recognizing IHS's discretion

in the allocation of its appropriations and finding the exercise of that discretion unreviewable).

Section 5325(a)(2) requires IHS to "add" to the Secretarial amount

an amount for the reasonable costs for activities which must be carried on by a
tribal organization as a contractor to ensure compliance with the terms of the
contract and prudent management, but which—

(A) normally are not carried on by [IHS] in [it]s direct operation of the program;
or

(B) are provided by [IHS] in support of the contracted program from resources
other than those under contract.

*Id*. § 5325(a)(2).

Section 5325(a)(3)(A) further defines CSC as follows:

> The contract support costs that are eligible costs for the purposes of receiving funding under this chapter shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of—

>> (i)  direct program expenses for the operation of the Federal program that is the subject of the contract, and

>> (ii)  any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract,

> except that such funding *shall not duplicate any funding provided under subsection (a)(1) of this section*.

*Id*. § 5325(a)(3)(A) (emphasis added). Thus, § 5325(a)(2) and (a)(3)(A) authorize IHS to add CSC to the Secretarial amount to cover the non-duplicative, reasonable and necessary direct and indirect costs associated with the tribal contractor's administration of the IHS health care programs under contract that are financed by that Secretarial amount.  They cannot be reasonably construed to require IHS to pay CSC on Plaintiff's expenditure of non-IHS funds.

Plaintiff's proposed construction of § 5325(a)(2) and (a)(3)(A) to require IHS pay CSC on non-IHS funds would render § 5326 effectively meaningless, a result this court should avoid. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("statute should be construed so that effect is given to all its provisions."); *Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general."); *see also HCSC–Laundry v. United States*, 450 U.S. 1, 6 (1981) (*per curiam*) (the specific governs the general "particularly when the two are interrelated and closely positioned, both in fact being parts of [the same statutory scheme]"); *Mingo Logan Coal v. EPA*, 714 F.3d 608, 614 (D.C. Cir. 2013) (stating that "'one of the most basic interpretive canons' is that 'a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant'") (quoting *Corley,* 556 U.S. at 314); *Tunica*, 577 F. Supp. 2d

at 422-23.  Thus, § 5325(a)(2) and (a)(3)(A)'s general description of CSC should be construed so as to avoid § 5326's specific prohibition meaningless.

Contrary to Plaintiff's suggestion, *see* Pl.'s Mem. at 16-22, nothing in the ISDEAA provides for IHS to turn over any amount of Medicare, Medicaid, and other third party reimbursements to Plaintiff, because they are not IHS funds.  *See* 25 U.S.C. § 5325.[17]  As a result, the ISDEAA cannot reasonably be construed as requiring IHS to pay CSC as a result of Plaintiff's expenditure of those non-IHS funds.

Nor does Plaintiff's ISDEAA contract provide for IHS to turn over non-IHS funds to Plaintiff as part of the Secretarial amount.  Rather, Plaintiff's contract requires Plaintiff to "maintain a system of third party payment collection for services provided to patients of the Swinomish Tribal Health program" so that Plaintiff can obtain those reimbursements directly from CMS, the State of Washington, and other third-party payers.  Pl.'s 2010 FA § 2(B)(ix).  In other words, one of the IHS programs that Plaintiff assumed from IHS was a billing department (and the Secretarial amount and CSC to which it is entitled and for which it has been paid are those necessary to run that billing department), not an additional revenue stream from IHS.[18]  Indeed, Plaintiff freely admits that it has included as program income from third parties

---

[17] Nor, contrary to Plaintiff's contention, *see* Pl.'s Mem. at 10-11, does 25 U.S.C. § 5388(j) require Plaintiff to collect third-party revenues.  Rather, as the plain language of that provision makes clear, § 5388(j) provides that "Medicare, Medicaid, or other program income earned by the Indian tribe shall be treated as supplemental funding to that negotiated in the funding agreement."  25 U.S.C. § 5388(j).  Thus, § 5388(j) does not require Plaintiff to collect payments from third parties including the Medicare and Medicaid programs.  Rather, it requires that *if* Plaintiff obtains these reimbursements from non-IHS sources, Plaintiff must treat those payments as an additional, separate source of funding beyond that which the ISDEAA contract requires IHS to provide.  Section § 5388(j) is discussed in greater detail below.

[18] Contrary to Plaintiff's contention, this contractual provision does not even require Plaintiff to bill third parties such as Medicare and Medicaid for all eligible health care services provided, or to generate any particular or minimum amount or percentage of third-party revenue, only to maintain this billing system if they chose to bill third parties.  *See id.*

$79,991.44 in contract reimbursement from Upper Skagit Tribe, and $2,542.25 for book sales.

*See* Pl.'s Mem. at 11.  Plaintiff cannot seriously contend that expenditures of amounts received

from this reimbursement contract with another tribe or these book sales are also part of the

"Federal program" that it administering under its ISDEAA contract.  Subsection 5325(a)(2) and

(a)(3)(A) thus exclude expenditures of third-party reimbursements from CSC, because the tribal

contractor does not need additional CSC payments based on the amounts Plaintiff collects from

third parties and then expends.

1. **Section 5325(a)(3)(A)'s Non-Duplication Requirement Also Excludes Third-Party Payments from CSC**

Plaintiff's claim for CSC on the basis that Medicare, Medicaid, and other third-party

reimbursements should be treated as part of the Secretarial amount also runs afoul of

§ 5325(a)(3)(A)'s exclusion from CSC of any funds that duplicate costs provided in the

Secretarial amount.  *See* 25 U.S.C. § 5325(a)(3)(A).

When IHS directly operates a health care program, Congress requires it to place any

Medicare and Medicaid reimbursements it might obtain "in a special fund" to be held by the

agency, and to ensure that each IHS health care service unit "receives 100 percent of the amount"

of the funds it has collected from the service unit.  25 U.S.C. § 1641(c)(1)(A).[19]  Since "100

percent" of these funds directly "pass through" to the tribal contractor, § 5325(a)(3)(A)'s non-

duplication requirement excludes them from eligibility for CSC.  Thus, Plaintiff's claim that

third-party reimbursements are part of the "Federal program" does not advance its cause, because

they are still excluded by § 5325(a)(3)(A)'s non-duplication requirement.

This result actually accords with Plaintiff's position with respect to how CSC is

---

[19] When a tribal contactor requests that IHS collect these third party Medicare and
Medicaid funds for the contractor, Congress requires IHS to distribute 100 percent of those funds
to the tribal contractor.  *See id.; id*. § 1641(c)(2).

calculated on the Secretarial amount: Plaintiff openly admits that not every part of the Secretarial amount is entitled to CSC. *See* Pl.'s Mem. at 20. As Plaintiff notes, even though certain funds are part of the Secretarial amount, Plaintiff is not entitled to CSC on $212,977 in "capital expenditures and passthrough funds." *Id.*; *see also id.* at 11 n.4. The same would be true for Medicare and Medicaid and any other third-party reimbursement it obtains, because IHS is required to "ensure" that each IHS service unit (including that operated under Plaintiff's ISDEAA contract) "receives 100 percent of the amount collected," 25 U.S.C. § 1641(c)(1)(A), and because these payments already include direct and indirect costs associated with providing those services. Section 5325(a)(3)(A)'s non-duplication requirement would still exclude these third-party payments from eligibility for CSC precisely because Medicare and Medicaid payments include direct and indirect costs associated with providing those services.

Thus, nothing in the ISDEAA can reasonably be read as requiring IHS to provide recovery of Plaintiff's direct and indirect costs associated with its expenditure of Medicare, Medicaid, and other third party reimbursements. *Accord Ramah Navajo Chapter*, 112 F.3d at 1464 ("nothing in the Act entitles a tribe to a windfall or requires defendants to ignore indirect costs funding a tribe receives from other sources"), *overruled by statute on other grounds*, *supra*; *accord Samish Indian Nation v. United States,* 419 F.3d 1355, 1367 (Fed. Cir. 2005) ("Since the Samish never incurred any administrative costs, … no sensible reading of the [ISDEAA] would allow their present suit for these funds.").

### 2. *Pyramid Lake* Does Not Advance Plaintiff's Position

Contrary to Plaintiff's contention, *see* Pl.'s Mem. at 17, 24, 26, *Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534 (D.D.C. 2014) (Cooper, J.), does not advance its position. In *Pyramid Lake*, the plaintiff proposed expanding its ISDEAA contract to take over operation of IHS's Emergency Medical Services ("EMS") program on the Fort McDermitt Reservation. *See*

70 F. Supp. 3d at 540.  IHS decided to suspend its Fort McDermitt EMS program but did so *after*
it had received the contractor's proposal.  *See id.*  IHS thus declined the proposal on the grounds
that, going forward, there would no longer be an IHS program to take over, and on the additional
ground that, as a result of this reallocation, the proposed funding level for the contract would
exceed what IHS would be allocating to fund the program.  *See id.* (citing 25 U.S.C.
§ 5321(a)(2)(D)).  The court first held that IHS's declination was invalid because, as of the date
of the tribal contractor's proposal, there still was an IHS program to take over.  *See id.* at 543.
The court further held that the proposed funding level was not excessive because the proposed
funding level was based on what IHS "otherwise would have spent [to operate the IHS program],
not on the source of the funds [IHS] uses" to operate that program.  *Id.* at 544.  The court thus
ordered IHS to negotiate with the tribe to determine what IHS "would have otherwise provided"
to operate the EMS program, plus the administrative and start-up costs authorized under the
ISDEAA.  *Id.* at 545.  But nowhere in the decision did the *Pyramid Lake* court address the
statutory provisions at issue here: §§ 5325(a)(2), (3)(A), 5326, 5325(m), or 5388(j),[20] nor did it
address the amount of CSC to which that tribal contractor was entitled.  *See* 70 F. Supp. 3d. at
534-45.  *Pyramid Lake* is thus inapposite to the present dispute, and its offhand reference to the
"source of funds" is not sufficient to overcome the plain meaning of §§ 5325(a)(2), (a)(3)(A) and
5326.

### 3.  *Cook Inlet Tribal Council* Is Distinguishable

The court's recent ruling in *Cook Inlet Tribal Council, Inc. v. Mandegran*, 348 F. Supp.
3d 1 (D.D.C. 2018) (Sullivan, J.), *appeal filed*, No. 19-5005 (D.C. Cir.), is distinguishable from
the present dispute.  In *Cook Inlet*, the plaintiff proposed to amend its 2014 ISDEAA contract to

---

[20] Subsections 5325(m) and 5388(j) are discussed below, *see infra*, at 28.

include reimbursement in the form of direct CSC of all increases to its facilities costs since the contract was first awarded in 1992. *See* 348 F. Supp. 3d at 4. IHS declined the plaintiff's proposal on the grounds that it was already paying for the plaintiff's increased facilities costs as part of its payment of the Secretarial amount. *See id*. Examining 25 U.S.C. § 5325(a)(1), the court found that Congress had not "spoken to the precise question … [of] whether facility support costs must be exclusively funded by the Secretarial amount," *id*. at 9, and found that § 5325(a)(2)'s use of the word "normally" did not provide additional clarity in answering that question. *Id*. at 10-11. In light of these ambiguities, the court construed those provisions in favor of the plaintiff. *See id*. In reaching this conclusion, the court noted that IHS guidance provided that facility costs may sometimes "be eligible as [CSC]." *Id*. at 11 (citing Indian Health Manual ("IHM") § 6-3.2(D)), https://www.ihs.gov/ihm/pc/part-6/p6c3/); *see also id*. at 12-13 (same). The court also noted that IHS failed to provide any documentary evidence that increases in the Secretarial amount paid to the plaintiff since 1992 included increased amounts for facilities costs. *See id*. at 14. Additionally, the court noted that IHS regulations provide for some other costs to sometimes be includable in the Secretarial amount or sometimes paid by other means. *Id*. (citing 25 C.F.R. § 900.73). Nevertheless, the court was unable to determine whether the increased amount the plaintiff sought was "reasonable and allowable," under the ISDEAA and would not impermissibly "duplicate" funding already provided by the Secretarial amount. *Id*. at 17 (citing 25 U.S.C. § 5325(a)(2), (3)(A)). The court thus remanded the plaintiff's contract proposal to the agency for IHS to determine how much of Plaintiff's requested funding for facilities costs would be duplicative of amounts IHS had already provided as part of the Secretarial amount. *See id*.

   *Cook Inlet*'s determination that § 5325(a)(2) was ambiguous in answering the question of

whether facilities costs are eligible CSC is distinguishable from the present dispute about whether §§ 5325(a)(2), (3)(A) and 5326 require IHS to reimburse Plaintiff for its expenditures of non-IHS funds.  *Cook Inlet* did not address the meaning of § 5326 and did not have to interpret § 5325(a)(2) or (3)(A) in light of § 5326.  Unlike the dispute at issue in *Cook Inlet*, moreover, the Plaintiff in this case has not identified contradictions in agency guidance or regulations that would create ambiguity about how the terms of §§ 5325(a)(2) and (3) and 5326 apply to the expenditure of the non-IHS funds at issue.  Thus, *Cook Inlet* does not provide persuasive authority about the plain meaning of the ISDEAA provisions as applied to the situation at issue here.

### D.  Congress's Prohibition Against Using Program Income to *Reduce* Funds Otherwise Available to Tribal Contractors Cannot Reasonably Be Read to Require the *Additional* Payment of CSC on the Tribe's Expenditure of Program Income

Contrary to Plaintiff's contention, §§ 5325(m) and 5388(j) cannot be reasonably construed to override the clear terms of §§ 5325(a)(2), (a)(3)(A), and 5326.  Section 5388(j) provides that all "Medicare, Medicaid, and other program income earned by an Indian tribe shall be treated as supplemental to the amount negotiated in the funding agreement."  25 U.S.C. § 5388(j).  Similarly, § 5325(m) provides that "program income earned by a trib[e] in the course of carrying out a self-determination contract … shall be used by the trib[e] to further the general purposes of the contract."  *Id*.  In drafting these provisions, Congress clarified that "[s]uch [program income] shall not result in any *offset or reduction* in the amount of funds the Indian tribe is authorized to receive under its funding agreement," *id*. § 5388(j) (emphasis added); *id*. at § 5325(m) (program income "shall not be a basis for *reducing* the amount of funds otherwise obligated to the contract.") (emphasis added).  This is similar to clarifying language Congress has directed with regard to IHS appropriations and Medicare and Medicaid reimbursements.  *See id*. § 1641(a) (providing that IHS's collection of Medicare and Medicaid funds "shall not be

28

considered in determining appropriations for the provision of health care and services to Indians."). In other words, § 1641(a) prohibits considering Medicare, Medicaid, and third party reimbursements in determining congressional appropriations for all tribes. Similarly, §§ 5325(m) and 5388(j) clarify that IHS cannot use Medicare, Medicaid, and third-party reimbursements or other program income to offset the amount of CSC to which a tribal contractor would otherwise be entitled, and further clarify the obvious principle that a tribal contractor cannot use program income for any purpose other than carrying out the contract.[21]

But just because program income cannot be used for anything but ISDEAA contract purposes, and cannot serve as a basis for *reducing* the amount otherwise paid to a tribal contractor in either the Secretarial amount or associated CSC, it does *not* follow that the ISDEAA's recognition of the existence of program income can reasonably be construed as *increasing* Plaintiff's Secretarial amount and therefore requiring payment of additional CSC. Those are not the statutory terms that Congress used in § 5325(m) or § 5388(j). *See id.* § 5325(m) ("program income … shall be used … to further the *general purposes* of the contract"); *id.* § 5388(j) ("program income … shall be treated as *supplemental funding* to [the amount] negotiated in the funding agreement … [and] shall not result in any … *reduction* in … funds.") (emphasis added). Critically, Congress has not used the term "program income" in §§ 5325(a)(1), (2), or (3)(A). Nor has Congress characterized "program income" as part of the

---

[21] Nor, contrary to Plaintiff's contention, has IHS required that Plaintiff expend *all* such program income to provide additional health care services. Rather, Congress has provided that "amounts received [from Medicare or Medicaid]… shall *first* be used for purposes of making any improvements in the programs … which may be necessary to achieve or maintain compliance with the applicable conditions and requirements of [the Medicare and Medicaid programs]." 25 U.S.C. § 1641(c)(1)(B) (emphasis added). Congress further has provided that only "amounts in excess of the amount necessary to achieve or maintain such conditions and requirements shall … be used for reducing the health resource deficiencies … of such Indian tribes." *Id.*

Secretarial amount in those provisions or in § 5325(m) or § 5388(j).  To the contrary, Congress

characterized program income as "supplemental to that negotiated in the funding agreement."

*Id*. § 5388(j).  Thus, nothing in § 5325(m) or § 5388(j) can reasonably be construed to change the

clear meanings of § 5325(a) or § 5326.  It is well settled that "Congress kn[ows] how to

differentiate between [different statutory terms] when it want[s] to," and its choice not to use a

term elsewhere in the statute "should be given effect."  *Jones v. Bock*, 549 U.S. 199, 222 (2007);

*see also Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular

language in one section of a statute but omits it in another section of the same Act, it is generally

presumed that Congress acts intentionally and purposely in the disparate inclusion or

exclusion"); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature

uses certain language in one part of the statute and different language in another, the [C]ourt

assumes different meanings were intended."); *NRA v. Reno*, 216 F. 3d 122, 130 (D.C. Cir. 2000)

("[W]e presume that when Congress excluded qualifying language from [one subsection of a

statute], it did so intentionally"); *accord Navajo Nation v. Dalley*, 896 F.3d 1196, 1212 (10th Cir.

2018) (holding that the explicit reference to jurisdiction in one clause of statute and silence on

that issue in another clause "constitutes a significant clue that Congress did not intend for this

provision to relate to . . . the allocation of jurisdiction" in that second clause).

 Rather, §§ 5325(m) and 5388(j) are reasonably read only as overriding the default rule of

OMB cost principles that income earned by a federal program must normally be *deducted* from a

federal funding recipient's otherwise allowable costs to determine net allowable

costs.[22]  *Compare* 2 C.F.R. § 200.307(e)(1) (establishing the OMB cost principle default rule that

---

[22] The ISDEAA makes repeated references to OMB cost principles throughout the statute.  *See* 25 U.S.C. §§ 5304(f), (g) (defining IDC and IDC rates); 5305 (requiring tribes to file Single Agency Audit and allowing government to seek repayment of funds not used for the

income earned by a federal program must normally be *deducted* from a federal funding

recipient's otherwise allowable costs to determine net allowable costs) (emphasis added) *with id.*

§ 200.101(b)(3) (providing that "in any circumstances where the provisions of Federal statutes or

regulations differ from the provisions of this part, the provision of the Federal statutes or

regulations govern") (citing the ISDEAA as an example).  Accordingly, this Court cannot

reasonably read §§ 5325(m) or 5388(j) as overriding §§ 5325(a)(2), (a)(3)(A), and 5326 and

therefore somehow requiring IHS to pay CSC on the Plaintiff's expenditures of its Medicare and

Medicaid and other third party reimbursements.  *See FDA v. Brown & Williamson Tobacco*

*Corp.*, 529 U.S. 120, 133 (2000) ("A court must ... interpret [a] statute as a symmetrical and

coherent regulatory scheme, ... and fit, if possible, all parts into an harmonious whole.").

     Thus, while Plaintiff can and should use its available program income to provide

additional health care services, *see* 25 U.S.C. § 1641(c)(1)(B), it cannot require IHS to increase

CSC to provide additional reimbursements on Plaintiff's expenditure of those non-IHS funds.

     **1.   *Navajo Health Foundation—Sage Memorial Hospital* Is Not Persuasive**

     Contrary to Plaintiff's contention, *see* Pl.'s Mem. at 24-26, *Navajo Health Foundation—*

*Sage Memorial Hospital*, 263 F. Supp. 3d 1083 ("*Sage*"), does not provide persuasive authority

that should guide this Court's decision.  In *Sage*, the tribal contractor presented claims to the IHS

contracting officer for unpaid CSC, including CSC for costs allocable to the portion of the tribal

program funded by third-party reimbursements such as Medicare and Medicaid as well as the

tribally-funded portion of the program.  *See* 263 F. Supp. 3d at 1088.  Without analysis, the court

found that Medicare and Medicaid reimbursements were part of the federal program that the

---

purposes for which they were provided); 5322(e)(1) (authorizing the Secretary to award grants to
tribes to develop cost allocation plans for use in negotiating IDC rates); 5386(c)(2) (requiring
Title V tribes to apply OMB Cost Principles).

plaintiff took over under the ISDEAA contract.  *See id.* at 1163-66.  The court noted that

§ 5325(m) provides that program income cannot be a basis for reducing the amount provided

under the contract, and found without explanation that the plaintiff was entitled to receive "the

full amount" of its CSC on that program income.  *See id.* at 1166-68.  *Sua sponte*, the court then

engaged in a philosophical analysis of "form and individuation" before reaching what the court

characterized as its own "third way" of thinking about the non-duplication requirement of

§ 5325(a)(3)(A), but without actually ever articulating what that "third way" was.  *See id.* 1169-

78.  Indeed, the court did not actually resolve the question of how the non-duplication provision

should be applied in that case.  *See id.*

      The reasoning of *Sage* is not persuasive, and this Court should not follow that court's

conclusions.  Despite the length of its decision, the *Sage* court did not address the meaning of

§ 5326, and did not address how § 5325(a)(2) and (3)(A) should be interpreted in light of § 5326.

*See, e.g.*, 1163-68.  And although that court held that Medicare and Medicaid funds were part of

the federal program and that the plaintiff was entitled to the "full amount of CSC" on those

funds, it did not identify any actual direct or indirect costs of the plaintiff that would otherwise

go unreimbursed.  *See id.*  It did not address the fact that Medicare, Medicaid and other third

party payments are non-IHS funds.  It did not address the fact that the contract at issue in that

case did not provide for IHS to turn over those third-party funds to the plaintiff.  It did not

address the fact that by statute, Medicare and Medicaid reimbursements already reimburse

providers for direct and indirect costs associated with providing those health care services.  Thus,

it offered no convincing reason why such funds should be considered part of the Secretarial

amount or were entitled to CSC payments.  Additionally, there is not enough clarity in the court's

ruling on the non-duplication provision of § 5325(a)(3)(A) or how it applied in that case to

provide any guidance to this Court.  *See id.* at 1169-78.  Thus, this Court should not follow

*Sage.*[23]

## II.  PLAINTIFF HAS FAILED TO SUSTAIN ITS BURDEN OF PROVING DAMAGES FROM THE ALLEGED BREACH OF CONTRACT

Plaintiff is not entitled to recover damages for its breach of contract claim because it has

failed to sustain its burdens of proof required under the CDA.

As a preliminary matter, it is unclear whether Plaintiff has met its burden of establishing

that this Court has jurisdiction over the claim at issue here because Plaintiff has not even

identified when its Claim allegedly accrued, *see* Pl.'s Claim; Pl.'s Compl., and Plaintiff never

even alleged, let alone proved, that it timely presented its Claim to the IHS contracting officer.

Pl.'s Compl. *passim;* Pl.'s Mem. *passim*; *see also YRC, Inc.*, 104 Fed. Cl. at 364 (plaintiff's

burden to establish jurisdiction under the CDA); 41 U.S.C. § 7103(a)(1), (4)(A), (b) (requiring

claims be presented to contracting officer within six-years of accrual).  Plaintiff asserts that "IHS

failed to pay CSC associated with the portion of the Tribe's federal health care program funding

by third party revenues."  Pl.'s Claim at 2.  Services the tribe provided before December 20,

2010, occurred more than six years before Plaintiff presented its claim.  *See id.*  This Court

would seem to lack jurisdiction over that portion of Plaintiff's claim.  In any event, it is

Plaintiff's burden to establish jurisdiction, and it is not clear that Plaintiff has done so here.

More critically, Plaintiff has failed to meet its "burden of proving the amount of its

damages 'with sufficient certainty so that the determination of damages will be more than mere

speculation.'"  *Haehn Mgt. Co.*, 15 Cl. Ct. at 60; *see also Wilner v. United States*, 24 F.3d 1397,

1401 (Fed. Cir. 1994) (contractor has burden of proving damages *de novo* in federal court).  In

---

[23] Nor is the *Seminole Tribe* court's analysis of *Sage* persuasive.  *See Seminole Tribe*, 2019 WL 1259478, at * 9.  In *Seminole Tribe*, the court's analysis of *Sage* was confined to explaining why the case was distinguishable from the issue before that court.  *See id.*

this case, Plaintiff's sole evidentiary basis for proving damages is its 2010 audit.  *See* Pl.'s Mem.

at 11; Pl.'s Claim at 2.  The only place in Plaintiff's audit that shows these costs is on page 14, in

the third column, and again on page 78, in the second column, which state that for IHS Self

Governance, Plaintiff received $3,721,054 in grants and contracts, $636,421 in program income,

and $27,730 in other income.  *See* Pl.'s Audit at 14, 78.  The audit also shows that Plaintiff

expended $3,277,884 in "social and health" expenditures (including $193,177 in contractual

services), $1,027,273 in indirect costs, and $19,800 in capital outlay.  *See id.* at 78.  Plaintiff's

audit does not even show if Plaintiff expended all these funds for IHS health programs it was

under contract to administer, only that it expended them for "social and health programs."  *Id.*

Plaintiff's audit is thus insufficient documentary proof to sustain its burden of proving its

damages.

Assuming *arguendo* that Plaintiff is entitled to CSC on its expenditure of program

income, Plaintiff alleges but does not even attempt to prove, *see* Pl.'s Mem. at 11, that all

revenues it booked as program income and as "other income" qualify as "program income"

under the ISDEAA.  *See* 25 U.S.C. §§ 5325(m); 5388(j).[24]  Other than its audit, however,

Plaintiff has not come forth with any other documentation showing the source of funds its claims

as program income and other income.  Plaintiff offers no proof of amounts reimbursed for

Medicare services it provided, amounts reimbursed for Medicaid services it provided, and any

other amounts reimbursed from other third parties for health care services provided that may be

properly claimed as program income under the ISDEAA.[25]  Plaintiff, moreover, freely admits

---

[24] *See also* 2 C.F.R. § 200.80 ("Interest earned on advances of Federal funds is not program income.").

[25] Nor has Plaintiff shown what "amounts received" from Medicare or Medicaid it used to fulfill its duty "*first* … for purposes of making any improvements in the programs … which may be necessary to achieve or maintain compliance with the applicable conditions and

that not all funds it booked as program income came from Medicare, Medicaid, or other third-party insurers; it admits that it has included $79,991.44 in contract reimbursement from the Upper Skagit Tribe as program income.  *See* Pl.'s Mem. at 11.  Plaintiff's audit does not mention this reimbursement contract, and Plaintiff has not otherwise made the contract available, leaving no way for Defendants or this Court to evaluate whether this reimbursement contract was for health care services provided under the ISDEAA contract and was therefore properly included as program income.  Plaintiff also appears to include $27,730 in other income.  *See* Pl.'s Audit at 14; *id.* at 78.  If this is income from interest, it is not program income under the ISDEAA.  *See* 2 C.F.R. § 200.80.

Nor has Plaintiff made any effort to meet its burden of proving its claimed costs qualify as CSC under the ISDEAA.  See *Ketchikan Indian Cmty.*, 13 BCA ¶ 35,436 (burden to establish liability in CSC claims includes "establishing that a particular cost is a CSC").  Plaintiff, for example, claims it is entitled to an increase in direct CSC, asserting that it spent its program income on additional salaries that resulted in increased "fringe benefits," which it seeks to have reimbursed as CSC.  *See* Pl.'s Mem. at 21.  Yet, instead of showing the additional salaries or the costs associated with the increased fringe benefits, Plaintiff just makes up its own cost-ratio formula to support its claimed amount.  *See id.*  Nothing in the audit demonstrates the salary increase, the associated fringe benefits costs, or the ratio Plaintiff now puts forward to support its claim.  This Court need not accept Plaintiff's speculative formula for determining damages. *Accord Haehn Mgt. Co.*, 15 Cl. Ct. at 60.

---

requirements of [the Medicare and Medicaid programs]."  25 U.S.C. § 1641(c)(1)(B).  Indeed, § 5388(j) provides that a tribal contractor may expend such Medicare and Medicaid funds "except to the extent that the [IHCA, 25 U.S.C. § 1601 *et seq.*] provides otherwise."  25 U.S.C. § 5388(j).  Plaintiff appears to suggest, but does not establish, that it spent 100 percent of its program income and other income providing additional health care services.  *See* Pl.'s Mem. at 11.

Thus, Plaintiff has failed to meet its burden of proving damages from the alleged breach and therefore cannot support its request for declaratory relief, leaving no other remedy for this Court to apply.

## **CONCLUSION**

This Court should deny Plaintiff's motion for summary judgment and grant Defendants' cross motion for summary judgment, and enter judgment for Defendants.  A proposed order is attached.

Dated: April 4, 2019

<div style="margin-left:40%">

Respectfully Submitted,

JESSIE K. LIU, D.C. BAR # 472845
United States Attorney for the District of Columbia

DANIEL F. VAN HORN, D.C. BAR # 924092
Chief, Civil Division

By:

/s/ Christopher Hair
CHRISTOPHER HAIR, Pa. BAR # 306656
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
CIVIL DIVISION
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2541

</div>