# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SWINOMISH INDIAN TRIBAL
COMMUNITY,

       *Plaintiff*,

  v.

ALEX M. AZAR, *et al.*,

       *Defendants.*

No. 18-cv-1156 (DLF)

## MEMORANDUM OPINION

The plaintiff Swinomish Indian Tribal Community brings this action under the Contract Disputes Act, 41 U.S.C. § 7101 *et seq.* and the Declaratory Judgment Act, 28 U.S.C. § 2201, as allowed by the Indian Self Determination and Education Assistance Act, 25 U.S.C. § 5331(a), for an alleged breach of contract and statutory violation by the Indian Health Service (IHS). Before the Court are the parties' cross-motions for summary judgment. Dkts. 21, 28. For the reasons that follow, the Court will grant the defendants' motion and deny the plaintiff's motion.

## I.    BACKGROUND

### A.    Statutory Background

The Indian Health Service (IHS), an agency in the U.S. Department of Health and Human Services (HHS), delivers health-related programs, services, and activities to American Indians. *See* Compl. ¶ 11–12, Dkt. 1. When it delivers these services directly to tribal beneficiaries, it operates its own service unit facilities. *See id.* ¶ 18; *see also* Pl.'s Mem. at 8, Dkt. 21-2. Alternatively, the Indian Self Determination and Education Assistance Act (ISDEAA), 25 U.S.C.

§ 5301 *et seq.*, authorizes federally recognized Indian tribes and tribal organizations to assume responsibility for the health care programs that the IHS would otherwise provide.

Title V of the ISDEAA, *id.* § 5381 *et seq.*, establishes the guidelines for Tribes who wish to enter into self-governance contracts with the IHS. Such tribes do so by negotiating multiyear funding agreements to carry out their contracts. *See id.* § 5388(a)–(b). Title V entitles tribes with self-governance contracts to two types of funding: "amounts for direct program costs specified under section 5325(a)(1) . . . and amounts for contract support costs specified under section 5325(a) (2), (3), (5), and (6)." *Id.* § 5388(c). Title I, in turn, defines those types of funding. *See id.* § 5325(a).

The first type of funding, an amount for "direct program costs," *id.* § 5388(c), includes an "amount of funds" that "shall not be less than the [IHS] Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract," *id.* § 5325(a)(1). In other words, a tribe receives "the amount the Secretary would have provided for the [programs, functions, services, and activities] had the IHS retained responsibility for them." Compl. ¶ 15. Funding provided for direct program costs under § 5325(a)(1) is known as the "Secretarial amount." *Id.*

The second type of funding, an amount for contract support costs (CSC), "shall be added" to the Secretarial amount for:

> reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—
>
> > (A) normally are not carried on by the respective Secretary in his direct operation of the program; or
> >
> > (B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

*Id.* § 5325(a)(2).  The CSC amount includes two kinds[1] of "reasonable and allowable costs":

    (i)  direct program expenses for the operation of the Federal program that is the subject of the contract, and

    (ii)  any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract[.]

*Id.* § 5325(a)(3)(A).  These two expense categories are known as "direct CSC" and "indirect CSC," respectively.  Compl. ¶ 16.  Direct CSC covers costs incurred to operate a specific program, such as workers' compensation, while indirect CSC covers overhead that benefits more than one program, such as information technology systems.  *Id.*; *see also* Defs.' Cross-Mot. at 5 n.8, Dkt. 28.  Indirect CSC is calculated by "multiplying a negotiated indirect cost rate by the amount of the direct cost base."  Compl. ¶ 24.  In turn, the direct cost base is defined as "[t]otal direct costs, less capital expenditures and passthrough funds."  *Id.*  The ISDEAA further provides that both types of CSC "shall not duplicate any funding provided under" the Secretarial amount in subsection (a)(1).  25 U.S.C. § 5325(a)(3)(A)(ii).

      When the IHS provides direct services to beneficiaries, the Indian Health Care Improvement Act (IHCIA) authorizes it to bill and collect reimbursements from Medicare, Medicaid, the Children's Health Insurance Program, and private insurers (third parties) for services it provided to eligible individuals.  Compl. ¶ 18.  These collections, called program income or third-party revenue,[2] are placed in a "special fund" that is passed through "100 percent" to the IHS service unit entitled to the reimbursement.  25 U.S.C. § 1641(c)(1)(A).

---

[1] Section 5325(a)(5)–(6) describes a third category of CSC for pre-award and start-up costs that is not at issue in this case.  *See* Compl. ¶ 16.

[2] "Program income," "third-party revenue," and "program income collected from third-parties" are used interchangeably.

Alternatively, tribes may opt to bill and receive payments from third parties directly. *Id.*

§ 1641(d)(1). The IHS and the tribes both must use any third-party revenue they collect to make improvements in facilities necessary to comply with the Social Security Act, to provide additional health care services, or for another health care-related purpose consistent with the IHCIA and the ISDEAA. *Id.* §§ 1641(c)(1)(B), (d)(2)(A). Additionally, Title V of the ISDEAA addresses third-party revenue in the following provision:

> All Medicare, Medicaid, or other program income earned by an Indian tribe shall be treated as supplemental funding to that negotiated in the funding agreement. The Indian tribe may retain all such income and expend such funds in the current year or in future years except to the extent that the Indian Health Care Improvement Act (25 U.S.C. 1601 *et seq.*) provides otherwise for Medicare and Medicaid receipts. Such funds shall not result in any offset or reduction in the amount of funds the Indian tribe is authorized to receive under its funding agreement in the year the program income is received or for any subsequent fiscal year.

25 U.S.C. § 5388(j).

The question in this case is whether, when a tribe collects its own third-party revenue pursuant to 25 U.S.C. § 1641(d)(1), its expenditures of those funds on health care services are eligible for CSC funding from the IHS under the ISDEAA, *id.* §§ 5325, 5388.

**B.      Factual Background**

The Swinomish Indian Tribal Community is a federally recognized Indian tribe whose reservation is in Skagit County, Washington. Compl. ¶ 10.[3] In 1997, the it entered into a Compact of Self Governance Between the Swinomish Indian Tribal Community and the United States of America (Compact), Pl.'s Mot. Ex. A, Dkt. 21-3, under Title V of the ISDEAA. Since then, the Tribe has been carrying out "a range of health care programs, functions, services, and

---

[3] Except as otherwise noted, the following facts derive from undisputed portions of the statements of facts submitted by the Tribe and the IHS. The Court therefore dispenses with parallel citations to the parties' responses.

activities at its medical and dental clinics on the Swinomish Reservation." Compl. ¶ 10. Like

ISDEAA Title V, the Tribe's Compact addresses third-party revenue with the following

provision:

> All Medicare, Medicaid and other program income earned by the Tribe shall be
> treated as additional supplemental funding to that negotiated in the [funding
> agreement]. The Tribe may retain all such income and expend such funds in the
> current year or in future years except to the extent that the Indian Health Care
> Improvement Act (25 U.S.C. 1601 *et seq.*) provides otherwise for Medicare and
> Medicaid receipts. Such funds shall not result in any offset or reduction in the
> amount of funds the Tribe is authorized to receive under its [funding agreement]
> in the year the program income is received or for any subsequent fiscal year.

Compact, Art. III, § 5.

On November 2, 2009, the parties entered into a Funding Agreement for Calendar Year

(CY) 2010–2014 (Funding Agreement), Pl.'s Mot. Ex. B, Dkt. 21-4. In accordance with Title V,

the Funding Agreement included both the Secretarial amount for direct program costs and CSC

funding for direct and indirect administrative costs. *See id.* § 4. For CY 2010, the Tribe's

negotiated indirect cost rate was 31.91%. Compl. ¶ 24; *see also* Indirect Cost Negotiation

Agreement, Pl.'s Mot. Ex. C at 4, Dkt. 21-5. Thus, under the Agreement, the amount of indirect

CSC funds that the Tribe received was calculated by multiplying the indirect cost rate by the

direct cost base. *See* Funding Agreement § 6. The CY 2010 award totaled over $3,000,000,

including $755,965 for indirect CSC and $153,374 for direct CSC. Defs.' Am. Answer ¶ 27,

Dkt. 26-1.[4]

---

[4] The Tribe cites $3,028,213 as the total CY 2010 award, Compl. ¶ 27, while IHS cites
$3,152,275, Defs.' Am. Answer ¶ 27. IHS's figure appears supported by the audit information
that the Tribe submitted. *See* Report of Independent Auditors and Primary Government
Financial Statements with Supplemental Information for Swinomish Indian Tribal Community,
Year Ended Dec. 31, 2010 (CY 2010 Audit), Pl.'s Mot. Ex. D at 89, Dkt. 21-6. Nonetheless, this
disagreement is immaterial to the outcome of this case, so the Court can resolve these summary
judgment motions without resolving this apparent discrepancy.

In CY 2010, the Tribe collected $636,421 in "program income" from third parties including Medicare, Medicaid, and private insurers and $27,730 in "other income" for a total of $664,151. *Id.* ¶ 23 (citing CY 2010 Audit at 14). Of that amount, the Tribe states that $553,888 was earned from clinic revenues, $79,991 from contract reimbursement from the Upper Skagit Tribe, $2,542 from the Tribe's book sales, and $27,730 from interest. Pl.'s Opp'n at 21–22, Dkt. 29. That year, the Tribe spent this revenue and the lump-sum direct program appropriation provided by the IHS under its Funding Agreement on "social and health services" and "capital outlay." Defs.' Am. Answer ¶ 23 (citing CY 2010 Audit at 14). The IHS did not pay an additional amount of CSC for the expenditures of third-party revenue. Compl. ¶ 23. Instead, these expenditures were excluded from the direct cost base and thus did not factor into IHS's basis for calculating and paying additional CSC under either the Funding Agreement or the Compact. *See* Defs.' Am. Answer ¶¶ 36, 50.

On December 20, 2016, the Tribe submitted a certified claim to the IHS contracting officer for $245,867 in CSC funding, which was on top of the $909,339 in CSC funding that it received under its CY 2010 Funding Agreement. *See* Pl.'s Mot. Ex. E at 3, Dkt. 21-7.[5] The Tribe claimed that the ISDEAA, the Compact, and the Funding Agreement entitle it to the additional CSC because the IHS had "failed to pay CSC associated with the portion of the Tribe's federal health care program funded by third-party revenues, such as payments from

---

[5] The Tribe's $245,867 request includes $33,639 in direct CSC, which it calculated using a historical ratio of direct CSC actually paid to its total award for CY 2010. Compl. ¶ 27. The IHS denies that this is the proper method for calculating direct CSC. Defs.' Am. Answer ¶ 27. The request also includes $201,494 in indirect CSC, calculated by applying its indirect cost rate of 31.91% to total third-party expenditures less a "proportionate share of passthroughs and exclusions." Compl. ¶ 26. Last, it includes $10,734 more in indirect CSC, calculated by applying its indirect cost rate to its future expenditure of the $33,639 it requests in direct CSC. *Id.* ¶ 28.

Medicare, Medicaid, and private insurance." *Id.* at 2. On May 22, 2017, the IHS contracting officer denied the Tribe's claim because "Swinomish did not provide any documentation to support its claims" and "has not demonstrated that the claimed costs are for activities that are eligible for CSC pursuant to 25 U.S.C. § 5325(a)." Pl.'s Mot. Ex. F at 2, Dkt. 21-8.

The Tribe filed its complaint in this action on May 17, 2018 to compel the IHS to pay the additional CSC funds for CY 2010. Compl. ¶ 46(2)(A).[6] It brings the complaint under the Contract Disputes Act, 41 U.S.C. § 7101 *et seq.*, as authorized by the ISDEAA, 25 U.S.C. § 5331(a). The Tribe also seeks a declaration that it is entitled to CSC on third-party revenue expended on health care services within the scope of the ISDEAA, Compl. ¶ 46(2)(C), under the Declaratory Judgment Act, 28 U.S.C. § 2201. The IHS answered and counterclaimed on July 30, 2018, Dkt. 10, and filed its Amended Answer on April 4, 2019 dropping its counterclaim, Dkt. 26. Both parties now move for summary judgment. Dkt. 21, 28.

## II.      LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). And a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. "If there are no genuine issues of material fact, the moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a showing sufficient

---

[6] The complaint contains two paragraphs 46, which the Court will refer to as 46(1) and 46(2).

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Holcomb*, 433 F.3d at 895 (internal quotation marks omitted).

## III.     ANALYSIS

The question in this case is purely legal: Should the Tribe have received CSC funding based on third-party revenue from Medicare, Medicaid, and private insurers that the Tribe collected and then spent on health care services? The parties agree about the relevant material facts but offer competing interpretations of the relevant statutory provisions, including 25 U.S.C. §§ 5388 and 5325(a). For the reasons that follow, the Court concludes that that neither provision entitles the Tribe to CSC based on those expenditures.

### A.     Jurisdiction and Statute of Limitations

As a threshold matter, the Court must determine whether it has subject matter jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998); *see also* Fed. R. Civ. P. Rule 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

The CDA and the ISDEAA confer subject-matter jurisdiction on this Court. Under the CDA, a tribe seeking underpaid CSC must first "make a claim in writing to a contracting officer at the relevant agency before it may sue in court," *Menominee Indian Tribe of Wis. v. United States*, 764 F.3d 51, 55 (D.C. Cir. 2014), *aff'd*, 136 S. Ct. 750 (2016) (citing 41 U.S.C. § 7103(a)), which the Tribe did on December 20, 2016, *see* Pl.'s Mot. Ex. E. Because the contracting officer denied the Tribe's claim, the ISDEAA enabled the Tribe to file directly in federal district court. 25 U.S.C. § 5331.

The claim is also not barred by the six-year time limit in the CDA. *See* 41 U.S.C. § 7103(a)(4). The IHS incorrectly asserts that because the Tribe did not "even allege[], let alone

prove[]," when its claim had accrued, it failed to meet its burden of establishing this Court's jurisdiction under the CDA. Defs.' Cross-Mot. at 33. But filing within the six-year timeframe is not a jurisdictional issue. *See Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 523 (D.C. Cir. 2010) ("We disagree that the [CDA's] limitations period is jurisdictional."). It is an affirmative defense. Fed. R. Civ. P. Rule 8(c); *Gordon v. Nat'l Youth Work All.*, 675 F.2d 356, 360 (D.C. Cir. 1982). Consequently, the burden is not on a plaintiff to prove timeliness in the complaint; instead, a defendant must raise it in the answer. *Long v. Howard Univ.*, 550 F.3d 21, 24 (D.C. Cir. 2008).

The IHS did not sufficiently raise the statute of limitations defense in its Amended Answer. The defense "need not be articulated with any rigorous degree of specificity, and it is sufficiently raised for purposes of Rule 8 by its bare assertion." *Daingerfield Island Protective Soc. v. Babbitt*, 40 F.3d 442, 445 (D.C. Cir. 1994) (internal quotation marks and emphasis omitted); *see also Long*, 550 F.3d at 24 (holding as sufficient the defendant's bare assertion that the "Plaintiff's claims are barred by the applicable statute of limitations"). In its Amended Answer, the IHS vaguely states that "[a]ll claims regarding Plaintiff's [CSC] funding for its [CY] 2010 [ISDEAA] agreement that were not specifically presented to the contracting officer . . . may also be time-barred." Defs.' Am. Answer ¶ 1 (footnote omitted). Unlike the "boilerplate" language in Long, the IHS does use a degree of specificity. *See id.* But the IHS preserved the statute of limitations defense only for claims "that were not specifically presented to the contracting officer." *Id.* And the IHS admits that the Tribe's claim here was specifically presented to the contracting officer. *See* Defs.' Cross-Mot. at 11 (admitting that the Tribe submitted a certified claim to the IHS contracting officer for $245,867); Compl. ¶ 46(2)(A)

(requesting relief totaling $245,867). Therefore, the IHS did not preserve a statute of limitations defense as to the claims presented here, and it may not raise such a defense now.

### B. Third-Party Income Under the ISDEAA

"As in all statutory construction cases," the Court must "begin with the language of the statute." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002); *Bullcreek v. Nuclear Regulatory Comm'n*, 359 F.3d 536, 541 (D.C. Cir. 2004). "The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Sigmon Coal Co.*, 534 U.S. at 450 (internal quotation marks omitted). "The structure of the statute is also relevant in understanding" its meaning. *Bullcreek*, 359 F.3d at 541. "The inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Sigmon Coal Co.*, 534 U.S. at 450 (internal quotation marks omitted).

When interpreting the ISDEAA, courts must heed the Indian canon of construction. The ISDEAA specifies that it "shall be liberally construed for the benefit of the Indian tribe participating in self-governance and any ambiguity shall be resolved in favor of the Indian tribe." 25 U.S.C. § 5392(f). Thus, when reviewing an agency decision under the ISDEAA, the court must "give the agency's interpretation careful consideration but . . . not defer to it." *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (internal quotation marks omitted). To succeed, the government agency "must demonstrate that its reading is clearly required by the statutory language." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 194 (2012). But the Indian canon of construction "need not be conclusive," *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001), and it "does not permit reliance on ambiguities that do not exist," *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986).

The Tribe argues that it is entitled to CSC for third-party expenditures on the basis of two provisions of the ISDEAA. First, the Tribe interprets § 5388(j) to consider third-party revenue a part of the Secretarial amount, on which CSC is based, because § 5388(j) requires the Tribe to expend third-party revenue to the Tribe's ISDEAA contract. Second, the Tribe reads the "Secretar[ial]" amount and "Federal program" in § 5325(a) to implicitly include any third-party revenue the Tribe collects and expends. For each provision, the IHS reaches the opposite conclusion: that § 5388(j) separates third-party revenue from the Secretarial amount and does not provide CSC for its expenditure, and that third-party revenue cannot reasonably be read into any part of § 5325(a). The Court will consider each statutory provision in turn.

1. *Section 5388(j)*

The Court agrees with IHS that § 5388(j)'s text and structure distinguish third-party revenue from the Secretarial amount, rendering third-party revenue not part of the basis for calculating CSC. Because Title V explicitly addresses program income from third-party revenue, the Court examines that provision first. It provides:

> All Medicare, Medicaid, or other program income earned by an Indian tribe shall be treated as supplemental funding to that negotiated in the funding agreement. The Indian tribe may retain all such income and expend such funds in the current year or in future years except to the extent that the Indian Health Care Improvement Act (25 U.S.C. 1601 et seq.) provides otherwise for Medicare and Medicaid receipts. Such funds shall not result in any offset or reduction in the amount of funds the Indian tribe is authorized to receive under its funding agreement in the year the program income is received or for any subsequent fiscal year.

25 U.S.C. § 5388(j).

Section 5388(j)'s text explicitly separates third-party revenue from the funding agreement. It clarifies that third-party revenue "shall be treated as *supplemental* funding to that negotiated in the funding agreement." *Id.* (emphasis added). And the Tribe's Compact likewise calls third-party revenue "*additional supplemental* funding to that negotiated in the [funding

agreement].”  Compact, Art. III, § 5 (emphasis added).  A “supplement” is: “[a] thing . . . added to make good a deficiency or as an enhancement” or “an extra payment or charge . . . a sum of money paid to increase a person’s income.”  Oxford English Dictionary (3d ed. 2012).[7]  And the word “additional” means: “in addition to something else; added, extra, supplementary.”  Oxford English Dictionary (3d ed. 2010).  Thus, under § 5388(j), third-party revenue is plainly an “extra” amount, something that is “added to” the amount negotiated in the funding agreement and not a part of the amount negotiated in the funding agreement itself.

Yet the statute makes clear that CSC is negotiated and calculated within the funding agreement.  Subsection (c) defines the “[a]mount of funding” provided under a funding agreement, and it explicitly includes “amounts for contract support costs specified under section 5325(a)(2), (3), (5), and (6) of this title.”  25 U.S.C. § 5388(c).  The parties’ own Funding Agreement accordingly included negotiated calculations for CSC.  *See* Funding Agreement § 6. (“The parties agree that under this [Funding Agreement] the Swinomish Indian Tribal Community will receive direct CSC in the amount of $141,514 . . . , and indirect CSC in the amount of $645,489.”).  Because third-party revenue is supplemental to the amount negotiated in the funding agreement, 25 U.S.C. § 5388(j), and CSC is negotiated within the funding agreement, *id.* § 5388(c), expenditures of such third-party revenue are not amounts eligible to be included in the amount from which CSC is calculated.

The overall structure of § 5388 further supports the conclusion that third-party payments are not included in CSC calculations.  *See Bullcreek*, 359 F.3d at 541 (noting that a statute’s structure is relevant in determining its meaning).  First, subsection (c) outlines resources

---

[7] Because the Oxford English Dictionary defines the adjectival form “supplemental” as “[o]f the nature of, forming, or serving as a supplement,” *id.*, it turns to the definition of “supplement.”

provided in a funding agreement, and those include the Secretarial amount and CSC. Subsequent subsections then outline various other tribal resources that are not included in the funding agreements, including third-party revenue (subsection (j)), reimbursements for goods and services (subsection (f)), interest on transfers (subsection (h)), and carryover funds (subsection (i)). The Court reads the ISDEAA's separation of subsection (c), where the funding agreement is provided, from subsections (f)-(j), where other resources are provided, as intentional. And only subsection (c), not the following subsections, provides for CSC. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alterations and internal quotation marks omitted)).

Although § 5388(j) prohibits the IHS from reducing CSC to which the Tribe is otherwise entitled because of third-party revenue, it does not require the IHS to provide additional CSC when the Tribe *expends* third-party revenue. First, if the IHS could treat the IHS and third-party revenue funds as truly "interchangeable," it could reduce appropriations when a tribe's third-party income increased. But § 5388(j) expressly prohibits such treatment. This provision requires the IHS to negotiate funding agreements without regard to third-party revenue, as its appropriation must remain the same regardless of how much a tribe earns, or if it earns any at all. *Cf.* 25 U.S.C. § 1641(a) (stipulating that the IHS's own collections of Medicare and Medicaid reimbursements "shall not be considered in determining appropriations for the provision of health care and services to Indians"). Any collection of third-party revenue thereby provides the Tribe with resources beyond those that it receives under the Funding Agreement.

Rather than requiring extra CSC payment on third-party revenue, § 5388(j) is better understood as an override of the normal Office of Management and Budget (OMB) cost principle that any federal program income can be grounds to reduce appropriations.  *See* 2 C.F.R. § 200.307(e)(1) (establishing the OMB cost principle that income earned by a federal program "[o]rdinarily . . . must be deducted" from a federal funding recipient's otherwise allowable costs "to determine the net allowable costs"); 25 U.S.C. § 5386(c)(2) (requiring all tribes operating under Title V of the ISDEAA to "apply cost principles under the [OMB], except as modified by section 5325").  It prohibits the IHS from reducing the Secretarial amount or CSC otherwise provided by the funding agreement based on the third-party revenue a tribe earns.  But nowhere does it specify that the Tribe should receive IHS funds in addition to third-party revenue.

For these reasons, the Court reads § 5388(j) to define third-party revenue as a source of funding that is supplemental to and separate from the amount negotiated in the funding agreement under § 5388(c) and thus ineligible for CSC.

    2.      *Sections 5325(a)(1)–(3)*

The Court also agrees with the IHS that § 5325(a) does not entitle the Tribe to collect CSC for its expenditure of third-party revenue, as that section's references to the "Secretarial amount" to which CSC must be added and the "Federal program" that generates CSC do not include third-party revenue.[8]  As explained, the Secretarial amount under § 5325(a)(1) is an

---

[8] The IHS also makes several case-specific arguments as to why this Tribe's expenditure of third-party revenue would not fall within the "Federal program" as described in § 5325(a)(3)(A). *See, e.g.*, Defs.' Reply at 18 (noting that the Tribe has not proven that it "expended all of these funds for IHS health care programs that it was under contract to administer").  For the purposes of this case, the Court need not determine whether the Tribe's specific expenditures are part of the federal program.

amount for direct program costs "not . . . less than the [IHS] Secretary would have otherwise provided for the operation of the programs."

The Tribe's arguments to the contrary fail. To start, § 5388(j)'s explicit textual reference to third-party revenue overrides the Tribe's general arguments about § 5325(a). "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). For statutes "in which a general authorization and a more limited, specific authorization exist side-by-side," the terms of the specific authorization govern. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Here, § 5325(a) generally entitles a tribe to receive CSC on expenditures of funds that are received as a result of the terms of its funding agreement with the IHS. The Tribe would have that provision govern its expenditure of third-party revenue also. But § 5388(j) specifically deals with third-party revenue in a "more limited, specific authorization." *Id.* at 645. That subsection says that the Tribe "*may* retain all such income and expend such funds," § 5388(j) (emphasis added), but it does not mention CSC payments. This specific provision governs and, as addressed above, excludes third-party revenue from CSC calculations.

In addition, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello*, 464 U.S. at 23 (alteration and internal quotation marks omitted). Section 5325(a)(1), which defines the Secretarial amount and CSC, does not reference third-party revenue. And § 5388(j), which deals with third-party revenue, does not reference the Secretarial amount or CSC. This separate provision directly addressing third-party revenue "demonstrates that Congress knew how to differentiate between" different funding sources, and the distinction "should be given effect."

15

*Jones v. Bock*, 549 U.S. 199, 222 (2007). Here, Congress has "described with some care the various situations" in which CSC is available in § 5325(a)(2)–(3), and separately described the uses of third-party income in Title V. *Nat'l R.R. Passenger Corp. v. United States*, 431 F.3d 374, 378 (D.C. Cir. 2005). The statute omits any provision of CSC for third-party expenditures and does not tie the Secretarial amount or CSC, which are both defined at § 5325(a), to third-party revenue, which is defined elsewhere at § 5388(j). Thus, what the Tribe seeks "is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted . . . may be included within its scope." *Id*. (internal quotation marks omitted). "To supply omissions transcends the judicial function." *Id*. (internal quotation marks omitted).

The statutory context as a whole further clarifies that the Secretarial amount in § 5325(a) refers to funds that the IHS pays the Tribe, not to third-party revenue that the Tribe itself earns. And the definition of the Secretarial amount in § 5325(a)(1) must not be read in a vacuum. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor."). "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear." *Id.* "[S]imilar language contained within the same section of the statute must be accorded a consistent meaning." *Janko*, 741 F.3d at 141 (internal quotation marks omitted) (concluding that a statute's ambiguous use of the term "United States" in two contexts must be accorded the same interpretation in both places).

Read together, the ISDEAA's various provisions clearly limit the Secretarial amount to funds that the IHS appropriates and exclude from that amount any third-party revenue that the Tribe collects on its own. Title V clarifies that "the [IHS] Secretary shall *transfer* to the Indian

tribe *all funds provided for* in the funding agreement, pursuant to subsection (c) of this section,"

25 U.S.C. § 5388(a) (emphasis added), and sheds light on the word "provided" used in

connection with the funding agreement in subsection (c) and § 5325(a)(1). And the other

sections that refer to the funding agreement describe funds "transfer[red]" or "paid" by the

Secretary under the compact or funding agreement, *see id.* §§ 5388(g), (h), (i). By contrast, the

subsection describing third-party revenue refers to "income *earned* by an Indian tribe," *id.* §

5388(j) (emphasis added). Notably, § 5388(k) also specifies that "[a]n Indian tribe shall not be

obligated to continue performance that requires an expenditure of funds in excess of the amount

of *funds transferred* under a compact or funding agreement," *id.* § 5388(k) (emphasis added),

implying that the total amount of funding provided to accomplish contractual obligations is what

"the Secretary . . . transferred under the under the funding agreement," *id. See also* 42 C.F.R.

§ 137.75 ("[T]he Secretary must *transfer* to a Tribe *all funds provided for* in the funding

agreement." (emphasis added)); Funding Agreement § 4, 7 (noting that "the amounts available to

the Tribe pursuant to the Compact and in accordance with Section [5388(c)] of Title V" "shall be

paid in advance to the Tribe in one lump sum payment").

Moreover, additional CSC for third-party expenditures would violate § 5325(a)(3)(A)

because it would at least partially "duplicate any funding provided under subsection (a)(1)." 25

U.S.C. § 5325(a)(3)(A)(ii). The third-party revenue already includes reimbursement for direct

and indirect costs incurred by the Tribe. Defs.' Cross-Mot. at 15–16.[9] The Tribe argues that

---

[9] Although the Tribe does not explicitly admit that third-party reimbursements include both
direct and indirect costs, it does not dispute this fact. It instead argues that the fact is immaterial.
*See* Pl.'s Opp'n at 10 ("Even if Medicare and Medicaid do fully reimburse direct and indirect
costs, these reimbursements are for past services already provided."); *id.* at 11 ("The possibility
that Medicaid or another third-party may have fully paid direct and indirect costs for past
services has no bearing on the issue presented in this case." (emphasis omitted)). Because the
Tribe says that the difference is not material to the outcome of the Court's analysis, the Court

recovery of past costs is irrelevant, for it is future services that matter. *See* Pl.'s Mot. at 19 ("[E]xpenditures of third-party funding on health care [services] enlarge the direct cost base to which the indirect cost rate is applied, generating additional indirect CSC need" by "creat[ing] additional administrative, overhead, and other expenses."). But there are several problems with this argument.

First of all, providing CSC for additional future services would duplicate reimbursements for past services. Under Title V of the ISDEAA, the IHS compensates a tribe for both direct and indirect costs associated with the health-related programs it provides. The IHCIA requires the tribe to use the revenue it collects from third-party insurers for health care services, and it permits the third-party revenue to be used to cover indirect as well as direct costs. Interpreting Title V to require the IHS to provide a tribe additional CSC for future expenditures financed by third-party revenue thus would result in duplicative payments. A tribe could use the initial CSC provided under its funding agreement to cover the indirect costs of its past services and then use the third-party revenue to cover the indirect costs of future health-related expenditures.[10] In this example, providing the tribe with added CSC for indirect costs associated with future health

_____

will treat these statements as concessions that the reimbursements include both direct and indirect cost for the purposes of analysis. And even if the fact that third-party revenue duplicate indirect reimbursements is disputed, the IHS does not need to rely on this fact to prevail in this case.

[10] In a simplistic example: if it costs a tribe $100 in both direct and indirect costs to provide health care services to an eligible individual, the tribe initially funds the service from its IHS Secretarial and CSC appropriation provided under the funding agreement at the beginning of that year. If the tribe later collects reimbursements from Medicaid for these earlier services, it can use the $100 in third-party revenue to fund both the direct and indirect costs associated with future health care services. Providing the tribe with additional CSC for indirect costs associated with future services would be duplicative, even if the tribe did not recover the full $100 it spent providing earlier services.

services that were funded by third-party reimbursements would be duplicative and result in the over-recovery of indirect costs.

In addition, the very nature of indirect CSC is that it does not necessarily create meaningful new overhead costs for pooled resources, such as information technology or human resources departments and audits.[11] *See Sage Memorial*, 263 F. Supp. 3d at 1112 (quoting testimony from the tribe that "were [it] to raise as much in third-party collections as it receives from the Secretarial amount, it could double its programmatic budget without meaningful new overhead."); Oxford English Dictionary (3d ed. 2004) (defining overhead costs as those "incurred in the upkeep or running of a plant, premises, or business, and *not attributable to individual products or items*" (emphasis added)). Any new CSC generated is incremental at most, and the Tribe's requested relief of the full 31.91% indirect cost rate would largely, if not totally, duplicate the indirect cost reimbursement built into third-party revenue.

### 3. *The Tribe's remaining arguments*

The Tribe principally relies on two district court cases to support its statutory arguments that the Tribe's collection and expenditure of third-party revenue should be considered part of the federal program for purposes of calculating CSC. They are inapposite.

The first, *Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534 (D.D.C. 2014), addressed a narrower issue than the one before this Court. There the district court considered only whether a tribe was entitled to an IHS Secretarial appropriation to run a certain program; it addressed neither the source of funds nor CSC. The court held that the IHS Secretary could not decline a tribe's proposal for a self-governed EMS program on the basis that IHS discontinued

---

[11] To the extent that the third-party billing system itself generates CSC, that amount is not in contention, as the IHS accepts that CSC is awarded for this activity. *See* Defs.' Cross-Mot. at 23.

that program and had previously operated it with redirected funds. *Id.* at 544. Instead, the Secretary had to appropriate to the tribe the funds the Secretary would have spent, regardless of where he would have obtained the funds. *Id*. Contrary to the Tribe's claim, this case cannot be fairly read as "holding that [the] Secretarial amount includes third-party funding." *See* Pl.'s Mot. at 4–5.

The Tribe's other main case, *Navajo Health Foundation—Sage Memorial Hospital, Inc. v. Burwell*, 263 F. Supp. 3d 1083 (D.N.M. 2016), is also distinguishable on several grounds. There the IHS reduced otherwise allocable CSC based on third-party revenue using an "allocation ratio." *See id.* at 1092. For example, if the tribe was otherwise entitled to $25 for CSC to support a $100 Secretarial amount, and the tribe raised and expended $100 more in third-party revenue, then IHS would reduce the previously allocated CSC to $12.50 because 50% of expenditures were now attributable to the third-parties. *Id.* at 1113 n.32. The *Sage Memorial* court held that the allocation ratio violated the ISDEAA when applied to third-party revenue because it directly contravened the provision that "program income . . . shall not be a basis for reducing the amount of funds otherwise obligated to the contract." *Id.* at 1167–68 (citing 25 U.S.C. § 5325(m), previously codified at 25 U.S.C. § 450j–1(m)).[12]

In addition, what the *Sage Memorial* tribe sought, the Swinomish Tribe already receives. The tribe in *Sage Memorial* argued that "the IHS needs to pay the full contracted CSC amount regardless how much [the tribe] is able to expand its programmatic budget via third party

---

[12] The Tribe argues that *Seminole Tribe of Florida v. Azar*, 376 F.Supp.3d 100, 113 (D.D.C. 2019) "adopted [the] core reasoning" of *Sage Memorial*, Pl.'s Opp'n at 5, but that case discussed *Sage Memorial* only to distinguish it. *See* 376 F.Supp.3d at 113. It also referenced *Sage Memorial* only in a discussion of 25 U.S.C. § 5326. Although the IHS makes an argument based on § 5326, *see* Defs.' Cross-Mot. at 17–21, the Court need not reach this issue because § 5325 and § 5588(j) are sufficient to resolve this case, and § 5326 does not change the Court's reading of those provisions regarding third-party revenue.

collections." *Id.* at 1113. In other words, it "should receive $25.00 for CSC whether [it] only

has a $100.00 programmatic budget from the Secretarial amount or a $200.00 programmatic

budget from adding $100.00 in third-party revenues to the $100.00 Secretarial amount." *Id.* at

1113 n.33. But the Tribe would have this Court go further, seeking in effect $50 in CSC (an

added $25) because of its added $100 expenditure of third-party revenue. The *Sage Memorial*

court's ultimate conclusion that third-party expenditures were "eligible to be reimbursed as CSC

*without use of an allocation ratio*," *id.* at 1162 (emphasis added), does not apply here.

Also, the *Sage Memorial* decision was under Title I of the ISDEAA, while this decision

is under Title V. Though this fact is not dispositive, it means that the *Sage Memorial* court did

not address the specific textual and structural implications of § 5388 as discussed above. Title

I's provision notably lacks the "supplemental" language included in Title V, and it also contains

a stronger statement about the use of third-party revenue to further the purposes of the ISDEAA

contract. *Compare* 25 U.S.C. § 5325(m) ("[P]rogram income earned by a tribal organization in

the course of carrying out a self-determination contract . . . shall be used . . . to further the

general purposes of the contract.") *with id.* § 5388(j) ("[P]rogram income earned by an Indian

tribe shall be treated as supplemental funding to that negotiated in the funding agreement. The

Indian tribe may retain all such income and expend such funds in the current year or in future

years.").

## CONCLUSION

In sum, the text, structure, and logic of § 5325(a) counsel against treating the Tribe's

collection and expenditure of third-party revenue as part of the Secretarial amount or federal

program for the purposes of calculating CSC owed. And because the statute is clear, the Indian

canon of construction does not bear on the outcome. *See Montana v. Blackfeet Tribe of Indians*,

471 U.S. 759, 766 (1985) (holding that "*ambiguous* provisions" should be interpreted to the benefit of the Indian tribe (emphasis added)); *see also* Pl.'s Mot. at 26 ("In the event the Court finds the statute ambiguous, the Court must construe it in favor of the Tribe.").

For the foregoing reasons, the Court grants the defendants' motion for summary judgment and denies the plaintiff's motion for summary judgment. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

September 9, 2019